**Glenn Matthew FRINK, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. 3106.**

Supreme Court of Alaska.

June 29, 1979.

Sue Ellen Tatter and Walter L. Carpeneti, Asst. Public Defenders, and Brian Shortell, Public Defender, Anchorage, for appellant.

W. H. Hawley, Asst. Atty. Gen., Anchorage, Avrum M. Gross, Atty. Gen., Juneau, for appellee.

Before BOOCHEVER, C. J., and RABINOWITZ, CONNOR, BURKE and MATTHEWS, JJ.

## OPINION

BOOCHEVER, Chief Justice.

Glenn Frink appeals his conviction of first degree murder, urging four grounds of error: first, inadmissible hearsay and character evidence was presented to the grand jury and the remaining evidence was insufficient for indictment; second, the prosecutor's failure to present exculpatory evidence to the grand jury requires dismissal of the indictment; third, the trial court incorrectly admitted the results of a search of defendant's car; and fourth, impermissible character evidence was introduced at trial. We reject each of these grounds and affirm the conviction.[1]

An analysis of defendant's claims of error requires that we review the facts in some detail.

Phillip Hillier was found dead in his car by a co-worker on Monday, November 24, 1975, after Hillier did not show up for work. The grand jury indicted Glenn Frink for the first degree murder of Hillier, and at trial, a jury found Frink guilty of the crime as charged.

Hillier had been romantically involved with Karen Check, with whom Frink had previously been involved. The motive asserted by the state was Frink's jealousy of boyfriends of Karen Check.

Frink had had a relationship with Check over three and one-half years. Testimony at trial revealed that the relationship was a stormy one. The two, Check and Frink, argued constantly, and their fights occa-

---

1. The court commends the parties for the high quality of the briefs. The forceful arguments of both parties were extremely helpful to the court in arriving at its decision.

sionally included violence. Check moved in with Frink in November of 1974. She moved out as a result of particular fights for short periods a number of times, and finally moved out not to return, in June of 1975. At that point, Frink and Check continued to see each other exclusively but lived apart. The fighting decreased for a time, but then reverted to the earlier pattern of constant arguing. Then, in October 1975, the two agreed to begin seeing other people.

At some point during this time, Check began, but not consistently, to refuse to speak to or see Frink. She sometimes directed the switchboard operator at her place of work to tell Frink either that she was busy or that she was out.

Check began to date other men. Frink was aware of this through conversations with Check as well as his having been present at her apartment when other men were present or expected.

In support of the state's theory that jealousy motivated Frink to kill Hillier, testimony was presented to the grand jury and at trial of previous incidents between Frink and people with whom Check was romantically involved. Those incidents are here outlined.

At the time Frink met Check and, for the first two years of their relationship, Check was married and living with her husband. Both Check and her former husband were allowed to testify to an incident that occurred in December 1973, in which Frink confronted her husband late at night at their home and demanded to speak with Karen Check alone. Check's husband testified that Frink discharged a pistol twice, that one shot hit near his foot, that the other was fired as he turned his back on Frink and walked into the house. The second shot was later found to have gone into the house. This incident led to Frink's conviction for careless use of a firearm. Frink admitted the incident but testified that he fired one shot into the air, and the other into the ground.

Another incident concerned Frink's statements to Carol Krizan, the switchboard operator where Check worked. On one of the occasions when Check directed that Frink be told that she would not see or speak with him, Krizan testified that Frink appeared and asked to see Check. Krizan told Frink that Check "isn't in." Krizan testified that Frink responded: "Well I won't hurt Karen [Check], but I'll get her friends."

In another incident occurring November 11, 1975, Frink came to the door of Check's house. After knocking at the door and receiving no answer, Frink went around back, climbed over two fences, and entered through an unlocked back door. Frink appeared very drunk, and upon finding Check in the company of another man (Bill Hodgson), told Hodgson to leave. Hodgson refused, and according to both Check and Hodgson, Frink said to Hodgson: "[E]ither you kill me now while I'm drunk or I'll kill you tomorrow when I'm sober." [2] Check then called the police. The officer and Hodgson testified that in being removed, Frink stated to Hodgson, "If you sleep with her tonight I'll kill you."

Check also testified that she received an anonymous phone call one evening the week before Hillier's death, and that Frink told her that the call had been from a man that Frink had hired to kill her. Frink further told Check that he had called it off because he realized he was unable to harm her.

There was testimony describing the relationship between Check and the victim, Hillier. Check testified that she first dated Hillier on the Friday prior to his death. Check testified that Frink became aware of Hillier because Frink was present at her house when Hillier arrived to pick her up on that Friday. The two, Frink and Hillier, were introduced; all three left the house whereupon Check and Hillier separated from Frink. Check testified that after that meeting, she told Frink that she expected to continue to see Hillier. On Saturday, Frink was again at Check's house when she expected Hillier to arrive to pick her up for the evening out. Check asked Frink to

2. Frink admitted the incident but claimed he had referred to fistfighting, not killing.

leave, telling him she expected Hillier and that she did not want Frink there when Hillier arrived. Frink departed before Hillier appeared. Frink admitted that he returned to Check's house throughout the evening waiting for her to return. Check did not return home until approximately noon the following day (Sunday) at which time Hillier dropped her off. Frink was seen in his car near Check's house at that time by a friend of Check's. Frink admitted on the stand that he had seen Hillier drop Check off, and that he had followed Hillier home to Government Hill. Frink further admitted that he confronted Hillier at his house then and asked Hillier to discontinue seeing Check for at least a period of a few days. Frink reported that Hillier refused his request stating "we were all adults and we do as we please." Check stated to a police officer that Hillier told her that Frink threatened Hillier's life if he did not discontinue seeing Check. This evidence was not introduced at trial on the ground that it was inadmissible hearsay. However, Check was allowed to testify that on that Monday, she had a very short phone conversation with Frink in which she told him not to threaten her friends any more. Frink denied making any threats against Hillier in their Sunday conversation or at any other time.

Later on that same Sunday, Hillier returned to Check's house for dinner. That was apparently the last time Hillier was seen alive. The next morning, Monday, Hillier did not appear for work, and that afternoon, a co-worker went to Hillier's house and found Hillier dead in his car in the driveway. The police were summoned, and it was determined that death was by shotgun blasts and had occurred earlier that morning.

The police interviewed Hillier's neighbors. Kipling Dam testified before the grand jury to unusual observations he had made the morning of the homicide. Dam reported that, when he went out at 7:05 to warm up and clear off his car, he saw "a blue or blue-green . . . late '60's Impala," parked behind his own with the engine idling and the windows cleared. Dam stated that he had never before seen the car in the neighborhood. Kip Dam testified that the occupant was slumped in the driver's seat and was behaving nervously. Kip Dam stated that he could not identify the occupant because "It was too dark in there. It was very early in the morning." Kip Dam testified that the car was still there when he left at 7:15. Police officers later showed Dam a 1970 Impala at the police parking lot which he felt was "identical" to the one he observed on November 24. Kip Dam acknowledged that he had earlier stated he thought it was a late '60's model while the one he identified was a 1970 model.[3]

The police did not focus on a suspect until Check came to see them on Tuesday, the day after Hillier was found dead. Check volunteered to the police the story of her relationship with Frink and Hillier's involvement. The police also learned from Check that Frink owned and drove a blue Chevrolet. The police corroborated her story by checking the police reports on the incidents with Check's former husband and with Hodgson. Check, at that time, related to the police that Hillier had told her that Frink had threatened him the day before his death.

Frink was put under surveillance by the police. Frink was seen entering Kelly's Photo Shop at approximately 4:00 p.m. Tuesday. As Frink returned to his car and began to back it out of the parking lot, he was approached by four plainclothes officers. The officers identified themselves as police and asked Frink to exit his vehicle. He complied and was patted down. At this point, testimony conflicts. Specifically, Officer Rice testified that he believed he in-

---

**3.** A car salesperson testified at trial that the differences in Chevrolets from 1967 through 1971 are rather subtle. The vehicles seen from the side look very, very similar. I think that an individual would have to be a buff, or a complete Chevrolet enthusiast to be able to tell at a glance what the differences are.

formed Frink at the time of the patdown that the officers were investigating the Hillier homicide, while Frink testified that he was not informed of the subject of the police investigation until after the search of his car.

Frink gave the officers permission to search the car. The search of the back seat yielded two spent shotgun casings. The officers then asked to look in the trunk. In response, Frink opened the trunk of the vehicle. In the trunk, the officers found a near-full box of unused shotgun shells as well as two shells unused but out of the box. These pieces of evidence, among others, were later removed from Frink's vehicle in the course of a search conducted at the police station.

After the search of the car, Officer Rice testified that Frink was asked if he would accompany the officers back to the police station for questioning. Frink apparently agreed to do so, although he later testified that he assumed he had no other choice. Upon arriving at the police station, Officer Rice interviewed him for a few minutes. Frink testified that at that point, he realized he was a suspect and asked to consult an attorney and was read his *Miranda* rights for the first time.

After consulting with his attorney, Frink agreed to make a detailed statement, and to submit to a swab test of his hands to determine whether he had recently fired a gun. After formal charging, the police asked Frink for permission to search his house for his shotgun. Frink gave that permission and signed a consent form to the same effect.

Frink gave a statement that evening which was essentially identical to his testimony at trial. Frink unsuccessfully asserted an alibi defense claiming that his Sunday confrontation with Hillier had been their last contact and that at the time of the shooting, he was at home, or on his way to work, or at work. The precise time of the shooting was never established.

## I. SUFFICIENCY OF EVIDENCE BEFORE THE GRAND JURY

Criminal Rule 6(q) states, in part: "The grand jury shall find an indictment when all the evidence taken together, if unexplained or uncontradicted, would warrant a conviction of the defendant." Criminal Rule 6(r) addresses what evidence a grand jury may hear:

> *Admissibility of Evidence.* Evidence which would be legally admissible at trial shall be admissible before the grand jury. In appropriate cases, however, witnesses may be presented to summarize admissible evidence if the admissible evidence will be available at trial. Hearsay evidence shall not be presented to the grand jury absent compelling justification for its introduction. If hearsay evidence is presented to the grand jury, the reasons for its use shall be stated on the record.

Frink alleges that the grand jury heard inadmissible character and hearsay evidence and that the remaining evidence was insufficient to indict him.

### A. Character Evidence Before the Grand Jury.

Frink initially objected to all testimony by Karen Check, Carol Krizan and Bill Hodgson about threats Frink had made. The state argued that this evidence was not character evidence but competent evidence indicating the defendant's motive to murder Hillier, that is, Frink's jealousy of people who were the object of Karen Check's affection. Frink's reply brief withdraws all objections to evidence "of defendant's threats against persons in the class of persons who shared Karen Check's affections."

Thus, we are left with one allegation of inadmissible character evidence by the defendant. Before the grand jury, Karen Check testified as follows:

Q. In your acquaintanceship with Mr. Frink, did you find him to be a violent man?

A. He was very violent.

Q. Of your own personal knowledge, what examples do you have of that?

A. From my—I know that he has hurt many people in his life, physically. With me he has hit me, things like

this. He has a very violent temper, extremely so; over small things he gets extremely upset.

Defendant admits that the proper remedy for the introduction of hearsay evidence is to evaluate the strength of the remaining testimony and the likely importance of the hearsay testimony to the grand jury.[4] Defendant argues, however, that here the prosecutor purposefully elicited inadmissible character evidence and that we should automatically dismiss the indictment, rather than evaluate the probable importance of the inadmissible evidence to the grand jury.

We reject the approach proffered by defendant. Frink offers no case support for his position,[5] and it makes no sense to dismiss an indictment without evaluating the probable significance of the inadmissible testimony.[6] A rule of automatic dismissal would be especially unfair in an area involving a defendant's past threats and acts of violence which are admissible in certain limited contexts.

B. Hearsay Evidence Before the Grand Jury.

Frink's brief initially alleged six instances of hearsay evidence before the grand jury. The state conceded one, namely, Karen Check's testimony that Phil Hillier, the deceased, told her that Frink threatened him. Frink's reply brief withdraws two instances, conceding their introduction was harmless error.[7] We now evaluate the other three alleged instances of hearsay before the grand jury: Karen Check's testimony about an anonymous phone call, Officer Rice's testimony about the results of an autopsy, and Rice's testimony about the results of a lab test.

Karen Check testified before the grand jury about an anonymous phone call she received:

Q. Did he [Frink] ever mention to you that he may have hired someone to kill you?

A. Yes, he did.

Q. And could you elaborate on that?

A. One night he had somebody call me. I don't know who it was. I took it to be from a bar because there was noise in the background, and this man said that Glenn had wanted to talk to me and would I please talk to him, and I said no and I hung up. The next day Glenn came over and said that that had been a black man that he hired to kill me.

Q. Okay. And did he then tell you he had—or he wasn't going to go through with that?

A. He said that he didn't want to hurt me and so he had called it off after he thought about it.

We find that this testimony is not inadmissible hearsay. The hearsay rule forbids evidence of out-of-court assertions in-

---

4. See note 16 infra.

5. Defendant relies on cases involving failure of the district attorney to present exculpatory evidence to the grand jury as establishing a rule of automatic dismissal. See State v. Gieffels, Nos. 75–4048 Cr. and 75–5594 Cr. (3d Dist., Alaska, Feb. 2, 1976), Johnson v. Superior Court, 15 Cal.3d 248, 539 P.2d 792 (1975). Defendant inaccurately characterizes these cases as adopting a remedy of automatic dismissal. In Gieffels, Judge Buckalew carefully examined the importance of the omitted material and found the jury would likely not have returned a true bill if the omitted evidence had been presented. In Johnson, the court did dismiss the indictment but did not indicate that dismissal was the automatic remedy for a prosecutor's failure to present exculpatory evidence, regardless of the significance of the evidence.

6. Whether dismissal of the indictment is the proper remedy for gross prosecutorial misconduct, such as the introduction of known perjured testimony before the grand jury, see United States v. Basurto, 497 F.2d 781, 785–86 (9th Cir. 1974); United States v. Gallo, 394 F.Supp. 310, 315–16 (D.Conn.1975), is a question that does not confront us, and we do not address.

7. In Webb v. State, 527 P.2d 35, 36 (Alaska 1974) (per curiam), we affirmed a denial of a motion to dismiss an indictment because hearsay evidence presented to the grand jury "was either peripheral or cumulative to direct testimony." This is true of the two hearsay statements conceded by the defense to be harmless error.

troduced to prove the truth of those assertions.[8] To the extent that the testimony referred to Frink having someone call Check, it is based on admissions by Frink to Check, a well recognized exception to the hearsay rule.[9] The caller from the bar merely indicated that Frink wanted to speak with Check, a fact which was not incriminating or in dispute. The primary policy underlying the hearsay rule is to permit cross-examination of the person on whose credibility the jury is being asked to rely.[10] But when the fact that words were uttered has legal significance, independent of the truth of the words, the hearsay rule does not exclude evidence showing the words were said.[11] The credibility of the person who heard the words is at issue and that person was before the jury and was subject to cross-examination.

The state wanted to prove that Karen Check heard certain words during an anonymous phone call. The grand jury could cross-examine Check, observe her demeanor, and evaluate whether she received the call and heard those words. The grand jury is never asked to rely on the credibility of the anonymous caller, but on the credibility of Karen Check, and thus evidence about the telephone call did not constitute inadmissible hearsay.

■ Before the grand jury, Investigator Rice testified about the results of an autopsy performed by Dr. Rogers and gun residue tests performed by lab technician Archie Green. Frink argues that Investigator Rice's testimony concerning results of tests conducted by others constituted inadmissible hearsay. He contends that the state

should have introduced the reports prepared by the experts, a practice we sanctioned in *McKinnon v. State,* 526 P.2d 18, 27–28 (Alaska 1974). The state argues that Frink suffered no prejudice and that it was not necessary to introduce the reports because Investigator Rice accurately summarized the findings of the experts.

In *McKinnon,* we permitted a district attorney to introduce the results of a lab analysis of cocaine, even though the evidence was hearsay:

> [W]e believe that the credibility of the author of the laboratory report and the report itself was adequately established by the fact that the author was a technician at Alaska Medical Laboratories. The author's professional and objective position, of which the grand jury was aware, warranted the use of the laboratory analysis at the grand jury hearing. A professional laboratory technician has no motive to prevaricate, and he is presumptively qualified to perform chemical analyses in a competent manner. We also note that there is little a technician's physical presence at a grand jury proceeding could add to a laboratory report; the technician could do no more than affirm that he did perform the test reported, and that those tests did indicate the presence of a narcotic substance. Vigorous cross-examination regarding the competence of the expert or the reliability of the test can hardly be expected in grand jury proceedings.

526 P.2d at 27–28 (footnote omitted).

Criminal Rule 6(r) permits the introduction of hearsay evidence if there is "compel-

---

8. McCormick on Evidence § 249, at 588 (2d ed. 1972); *see P.H. v. State,* 504 P.2d 837, 843 (Alaska 1972) (definition of hearsay); *Meyst v. East Fifth Ave. Serv., Inc.,* 401 P.2d 430, 437 n.15 (Alaska 1965) (same).

9. Admissions are words or acts of a party-opponent offered as evidence against him and are admissible either as non-hearsay, *see, e.g.,* Fed.R.Evid. 801(d)(2), or as an exception to the hearsay rule, *see, e.g.,* Cal.Evid.Code § 1220 (Deering 1966). *See generally* McCormick on Evidence § 262 (2d ed. 1972).

10. 5 Wigmore on Evidence § 1395, at 150 (J. Chadbourn rev. ed. 1974); *see Emmco Ins. Co. v. Wallenius Caribbean Line,* 492 F.2d 508, 511

(5th Cir. 1974); *Meyst v. East Fifth Ave. Serv., Inc.,* 401 P.2d at 437; *Sheedy v. Stall,* 255 Or. 594, 468 P.2d 529, 530 (1970).

11. *Watson v. State,* 387 P.2d 289, 293–94 (Alaska 1963); 2 Jones on Evidence § 271 (5th ed. 1958); McCormick on Evidence § 249, at 588 (2d ed. 1972); *see, e.g., Pingatore v. Montgomery Ward & Co.,* 419 F.2d 1138, 1142 (6th Cir. 1969), *cert. denied,* 398 U.S. 928, 90 S.Ct. 1818, 26 L.Ed.2d 90 (1970); *Kristich v. State,* 550 P.2d 796, 802 (Alaska 1976); *Hatzakorzian v. Rucker-Fuller Desk Co.,* 197 Cal. 82, 239 P. 709, 716 (1925).

ling justification" for its use.[12] In *State v. Gieffels*, 554 P.2d 460 (Alaska 1976), we elaborated on the meaning of "compelling justification"[13] and noted that *McKinnon*

> merely stands for the proposition that where a professional submits a technical report and his testimony would simply affirm that report, it is proper to introduce the evidence by hearsay testimony since the presumed inconvenience is a compelling reason for such evidence.

554 P.2d at 465 n.22.

Based on the purpose of Criminal Rule 6(r) and our past decisions, we find error in the grand jury proceeding. Reports from Dr. Rogers and technician Green should have been submitted to the grand jury, and Investigator Rice's testimony should have been confined to presenting the reports and answering questions about them. The rationale of *McKinnon* does not permit a police officer to offer far-ranging opinions about how he or she thinks an expert would answer hypothetical questions. The *McKinnon* exception does not permit an officer to draw conclusions in ballistics, lab analysis or any other field in which the officer is not expert.

The state's position skirts too close to the dangers the hearsay rule seeks to avoid. A peace officer testifying without a report may not accurately convey the results of tests in fields where the officer is not expert, and the grand jury would have no way of questioning the officer's testimony. This

situation undermines the goal of Criminal Rule 6(r) which is to make "a reliable determination . . . as to the probability of [the defendant's] guilt," *State v. Gieffels*, 554 P.2d at 465. The "compelling justification" in *McKinnon* was the inconvenience of requiring a technician or other expert to testify in person when the testimony would add little to the report submitted to the grand jury. The state offers no compelling justification to dispense with the preparation and presentation of a report.[14]

■ In this case, however, we find that the introduction of Officer Rice's testimony was harmless error. When inadmissible hearsay is introduced before the grand jury, our duty is to determine whether there was sufficient nonhearsay testimony to justify the indictment. See *Adams v. State*, —— P.2d ——, Opn. No. 1684 (Alaska, June 22, 1979); *State v. Taylor*, 566 P.2d 1016, 1019 (Alaska 1977). We now turn to that inquiry.

### C. Sufficiency of the Admissible Evidence.

■ We conclude that there was sufficient admissible evidence before the grand jury so that the two inadmissible pieces of evidence,[15] together with Investigator Rice's inadmissible testimony, were not critical in the decision to return a true bill.[16] Disregarding these items of evidence, the grand jury was presented with the following facts.

---

**12.** Criminal Rule 6(r) also requires:
> If hearsay evidence is presented to the grand jury, the reasons for its use shall be stated on the record.
The district attorney in this case complied with that requirement after introducing Investigator Rice's testimony about the autopsy and the gun residue tests.

**13.** In *Gieffels,* the court found that the expense of transporting eight out-of-state witnesses did not justify a police officer testifying about the purported statements of those witnesses. 554 P.2d at 465.

**14.** We have carefully compared the grand jury testimony of Investigator Rice and the trial testimony of Dr. Rogers and technician Green, and we find ourselves in agreement with the trial court's finding that Investigator Rice's summary was not misleading. Because we find

the admissible grand jury testimony sufficient to support the indictment, we do not decide whether it would be appropriate to apply the harmless error doctrine to a substantially accurate hearsay summary of reports prepared by others.

**15.** Check's testimony that Phil Hillier told her that Frink had threatened him and that Frink was generally a violent man.

**16.** See *Gieffels v. State*, 590 P.2d 55, 59 (Alaska 1979); *State v. Skan*, 511 P.2d 1296, 1297 (Alaska 1973) (per curiam); *Taggard v. State*, 500 P.2d 238, 242–44 (Alaska 1972). These cases evaluated the significance of inadmissible hearsay evidence in the grand jury's decision to return a true bill.

After Glenn Frink and Karen Check broke up, Glenn Frink continued to try to see or talk to Check. The testimony of Krizan, Hodgson and Check indicate that Frink specifically threatened anyone whom Check cared for (her boyfriends, her parents, and even Check herself) and was willing to go to some lengths to carry out these threats, including virtually breaking into Check's apartment when Hodgson was there. The detailed evidence of these specific kinds of threats dwarfs the significance of Check's general testimony that Frink was violent.

Frink, by his own admission, had followed Hillier home the day before the homicide to have words with him about Check. Critically, Kipling Dam identified Frink's car idling outside Hillier's house the morning of the homicide, a time when Frink denied to the police having been near Hillier's house. Investigator Rice, who was present during the autopsy, testified that Hillier had been shot twice with a shotgun. Investigator Hogan, who was also present during the autopsy, testified that shotgun pellets about the size of double aught buck were removed from Hillier's body. Evidence showed that Frink owned a 12 gauge shotgun and that the shotgun was recently fired. Finally, Investigators Rice and Hogan testified that two expended 12 gauge double aught buck shotgun shells were removed from Frink's car, along with a box of unused 12 gauge double aught buck ammunition. This evidence, "taken together, if unexplained or uncontradicted, would warrant a conviction of the defendant." Rule 6(q), Alaska R.Crim.P.

## II. PROSECUTOR'S FAILURE TO PRESENT EXCULPATORY EVIDENCE TO THE GRAND JURY

Before the grand jury, the prosecutor extensively questioned Kipling Dam about his identification of Frink's car as the car he had seen idling in front of Hillier's house the morning of the homicide. The prosecutor did not ask Dam to identify or describe the car occupant. After the prosecutor's direct examination, a grand juror asked Dam:

Q: Could you identify the man who was sitting in the car?

A: No, I couldn't. It was too dark in there. It was very early in the morning.

Q: Was he sitting there when you left?

A: Yes, he was.

Dam had initially indicated to a police investigator that the individual in the car might have been twenty to thirty years old, possibly with long hair. A taped interview with Dam conducted a week later by a police investigator contains the following exchange:

Q: Did you get a look at the occupant at all?

A: Not a clear look, just a shadow type, he slumped down and I couldn't tell the age, he seemed to have long hair, I couldn't really tell at all.

Frink is over thirty [17] and has short hair. He urged the trial court to dismiss the indictment because of the prosecutor's failure to present Dam's description of the car occupant to the grand jury. The trial court denied the motion, finding the discrepancy between Dam's statement to the police and his testimony to the grand jury was "not that critical."

On appeal, Frink argues that the prosecutor failed to present evidence to the grand jury, and that this violated Criminal Rule 6(q), Frink's right to an independent and unbiased grand jury, and his right to due process of law. The state contends the prosecutor has no duty to disclose exculpatory evidence to the grand jury, and that the omitted evidence did not tend to negate guilt to any significant degree.

■ We hold that the prosecutor has a duty to present exculpatory evidence to the grand jury pursuant to Criminal Rule 6(q) and that the prosecutor did not violate that duty in this case.

Criminal Rule 6(q) provides in part:

17. Frink was thirty-nine at the time Hillier was killed.

When the grand jury has reason to believe that other available evidence will explain away the charge, it shall order such evidence to be produced and for that purpose may require the prosecuting attorney to subpoena witnesses. . . . The grand jury shall find an indictment when all the evidence taken together, if unexplained or uncontradicted, would warrant a conviction of the defendant.

A requirement that the prosecutor present exculpatory evidence to the grand jury is implicit in the mandate of Criminal Rule 6(q). "The grand jury cannot be expected to call for evidence of which it is kept ignorant." *Johnson v. Superior Court*, 15 Cal.3d 248, 251, 539 P.2d 792, 794 (1975). "[T]he vital function [of the grand jury is] protection of the innocent against oppression and unjust prosecution." *State v. Gieffels*, 554 P.2d 460, 464 (Alaska 1976). *Accord, Burkholder v. State*, 491 P.2d 754, 757 (Alaska 1971); *State v. Shelton*, 368 P.2d 817, 819 (Alaska 1962). The grand jury cannot fulfill this function unless it hears evidence tending to refute, as well as establish, guilt. It is the prosecutor who mainly presents evidence to the grand jury,[18] and if the prosecutor does not present exculpatory evidence to the grand jury, it probably will not hear such evidence.

In *Johnson v. Superior Court*, 15 Cal.3d 248, 539 P.2d 792 (1975), the court interpreted a statute similar to Criminal Rule 6(q)[19] to require a prosecutor to present exculpatory evidence to the grand jury:

[T]he adversary system does not extend to grand jury proceedings. . . . [I]f the district attorney does not bring exculpatory evidence to the attention of the grand jury, the jury is unlikely to learn of it. We hold, therefore, that when a district attorney seeking an indictment is aware of evidence reasonably tending to negate guilt, he is obligated under section 939.7 to inform the grand jury of its nature and existence, so that the grand jury may exercise its power under the statute to order the evidence produced.

*Id.* 539 P.2d at 796. Although this court has never examined the issue, the trial court's long and well-reasoned opinion in *State v. Gieffels*, Nos. 75–4048 Cr. and 75–5594 Cr. (3d Dist., Alaska, Feb. 2, 1976), dismissed two indictments due to prosecutorial omissions of exculpatory evidence.[20]

The American Bar Association Standards Relating to the Prosecution Function and the Defense Function (Approved Draft 1971) imposes a similar obligation in section 3.6(b):

The prosecutor should disclose to the grand jury any evidence which he knows will tend to negate guilt.

Such a requirement is fully consistent with the proper role of the district attorney in a criminal prosecution. As a representative of the state, a district attorney should seek justice, not simply indictment or conviction. The ABA commentary to section 3.6 states that the obligation to present exculpatory evidence to the grand jury "flows from the basic duty of the prosecutor to seek a just result."[21] The court in *Johnson* stated:

---

18. The defendant may not be present when the grand jury is in session, unless the defendant is a witness. *See* Alaska R.Crim.P. 6(k). Although the grand jury may hear evidence on behalf of the defendant, it has no duty to do so, Alaska R.Crim.P. 6(p), except to the extent required by Criminal Rule 6(q).

19. The statute considered by the court was Cal. Penal Code § 939.7 (Deering 1971):

The grand jury is not required to hear evidence for the defendant, but it shall weigh all the evidence submitted to it, and when it has reason to believe that other evidence within its reach will explain away the charge, it shall order the evidence to be produced, and

for that purpose may require the district attorney to issue process for the witnesses.

20. The court in *Gieffels* viewed the prosecutor's duty before the grand jury as similar to the due process obligation imposed on the district attorney to disclose exculpatory evidence at trial. *See Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). We rest our decision on the mandates of Criminal Rule 6(q) and do not reach the due process issue.

21. American Bar Association, Standards Relating to the Prosecution Function and the Defense Function 89 (Approved Draft 1971).

"The duty of the district attorney is not merely that of an advocate. His duty is not to obtain convictions, but to fully and fairly present to the court the evidence material to the charge upon which the defendant stands trial . . . ." (*In re Ferguson* (1971) 5 Cal.3d 525, 531, 96 Cal.Rptr. 594, 598, 487 P.2d 1234, 1238.) 539 P.2d at 796.

We do not believe that the prosecutor's failure to question Dam about the description of the car occupant violated this duty. Although Dam had told the police that the car occupant might have had long hair, the consistent thrust of Dam's observations was that he could not identify the car occupant. Dam was fully questioned at trial about the details of his earlier statement. We think the prosecutor's presentation of Dam's testimony and Dam's response to the grand juror's question was a reasonable and fair presentation of Dam's observation.

■ This case illustrates an important fact about the prosecutor's duty to present exculpatory evidence to the grand jury. Dam's earlier statements in the police reports were certainly evidence that was discoverable and properly developed by Frink's attorney at trial. But the prosecutor's obligation to present exculpatory evidence to the grand jury does not turn the prosecutor into a defense attorney; the prosecutor does not have to develop evidence for the defendant and present every lead possibly favorable to the defendant.

A comparison of the omitted evidence in this case with the omitted evidence in *Johnson* and *Gieffels* is instructive. In *Johnson*, a magistrate, after hearing the defendant's testimony, dismissed a complaint charging the defendant with the sale of amphetamines. The defendant testified that he was not involved in the sale, but was present during it to inform on the person doing the selling. The district attorney then took the case before the grand jury and failed to tell the grand jury about the defendant's testimony that had caused the magistrate to dismiss the complaint. *Gieffels* was a circumstantial evidence case in which Gieffels, who was alleged to have carried a .38 revolver, was accused of having shot and killed a bartender in the course of robbing the bar. The exculpatory evidence not presented in that case was that the deceased was killed with a .44 caliber weapon.[22]

We have found that Criminal Rule 6(q) imposes on the prosecutor a duty to disclose exculpatory evidence to the grand jury, a duty the prosecutor did not violate in this case. We need not evaluate Frink's contention that the state constitution independently imposes such a duty.[23] Our finding that the prosecutor did not violate the duty imposed by Rule 6 means that the prosecutor would not have violated any constitutionally-imposed duty of disclosure.[24]

**22.** In *Gieffels*, the grand jury returned two indictments against the defendant, the first charging Gieffels with first degree murder based on premeditation, the second charging Gieffels with felony first degree murder. The second indictment was returned roughly one month after the first indictment. At the first grand jury proceeding, the prosecutor presented the evidence that death was caused by a .44 caliber weapon, but the trial court dismissed the indictment because unreliable hearsay was introduced before the grand jury. *See State v. Gieffels*, Nos. 75–4048 Cr. and 75–5594 Cr. at 6–26 (3d Dist., Alaska, Feb. 2, 1976). At the second grand jury proceeding, the prosecutor failed to present the evidence that death was caused by a .44 caliber weapon. This omission led the trial court to dismiss the second indictment. *Id.* at 26–30.

**23.** The defendant refers to two provisions of the Alaska Constitution. The first is article I, section 8, which provides in part: "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury . . . ." Before the promulgation of Criminal Rule 6, we relied on this constitutional provision in evaluating claims relating to grand jury proceedings. *See State v. Shelton*, 368 P.2d 817, 818–19 (Alaska 1962). The state constitutional due process clause provides that: "No person shall be deprived of life, liberty, or property, without due process of law." Alaska Const., art. I, § 7.

**24.** If anything, demonstrating that a prosecutor's omission violated a constitutional duty would be more difficult than demonstrating a violation of a rule-imposed duty. *Cf. United States v. Agurs*, 427 U.S. 97, 107, 96 S.Ct. 2392,

## III. FRINK'S CONSENT TO SEARCH HIS CAR

The police did not have a warrant when they searched Frink's car, and Frink argues that no exception to the warrant requirement is applicable. The state maintains a warrant was not necessary because Frink consented to both searches. We find that Frink consented to the searches,[25] and therefore do not examine the alternate theories offered by the state to validate the search.

■■■■■ A search conducted without a warrant will ordinarily be regarded as per se unreasonable unless it falls within one of the previously delineated exceptions to the warrant requirement. *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576, 585 (1967); *Erickson v. State*, 507 P.2d 508, 514 (Alaska 1973). One of those exceptions is a search to which an individual voluntarily consents. *Katz v. United States*, 389 U.S. at 358 n.22, 88 S.Ct. at 515 n.22, 19 L.Ed.2d at 586 n.22; *Sleziak v. State*, 454 P.2d 252, 256 (Alaska), *cert. denied*, 396 U.S. 921, 90 S.Ct. 252, 24 L.Ed.2d 202 (1969). When the state asserts any exception to the warrant requirement, the state has the burden of proof. *State v. Stump*, 547 P.2d 305, 307 (Alaska 1976). In *Erickson v. State*, we explained the state's burden when it asserts the consent exception to the warrant requirement:

> Note however, that "consent to a search, in order to be voluntary, must be unequivocal, specific and intelligently given, uncontaminated by any duress or coercion, and is not lightly to be inferred." 507 P.2d at 515 (footnote omitted).

■■■ The trial court found the state had proven Frink voluntarily consented and ruled the fruits of the searches admissible:

> [Y]ou take into account the totality of the circumstances, and the circumstances as I understood them in this case were such that Mr. Frink had in fact consented to that search because he was a person who knew what his rights were and therefore at the time that he allowed them to search his car when they asked him to do so, when they asked him to step out, to search his car, he did, and he voluntarily consented to the search.

Resolution in conflicts of testimony at the suppression hearing are left to the trial judge. *Sleziak v. State*, 454 P.2d 252, 260 n.22 (Alaska), *cert. denied*, 396 U.S. 921, 90 S.Ct. 252, 24 L.Ed.2d 202 (1969); *Weltz v. State*, 431 P.2d 502, 505 (Alaska 1967).

■■■ The trial court evaluated the totality of circumstances surrounding the search to determine if Frink voluntarily consented to it. The totality of circumstances test for voluntariness of a consent search is the prevailing federal standard, articulated by the Supreme Court in *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). In formulating its totality of circumstances analysis, the Court in *Schneckloth* sought guidance from cases involving the voluntariness of confessions:

> In determining whether a defendant's will was overborne [when the defendant

49 L.Ed.2d 342, 352 (1976) (prosecutor's duty to disclose exculpatory evidence before trial may be greater under federal rules than under due process clause).

**25.** The parties have not addressed the issue of whether a different standard would be appropriate in assessing the validity of a consent to search obtained from a person who is in custody as opposed to a person who gives consent in a noncustodial situation. *See Schenckloth v. Bustamonte*, 412 U.S. 218, 232, 240 n.29, 93 S.Ct. 2041, 2050, 2055 n.29, 36 L.Ed.2d 854, 865, 870 n.29 (1973). *Cf. Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (in-custody defendant must be advised of certain rights before interrogation by police).

We do not address the issue. The record indicates that Frink was not in custody when he consented to the search of his car. In *Hunter v. State*, 590 P.2d 888, 895–96 (Alaska 1979), we adopted the reasonable person test for custody and discussed the factors relevant to a determination of custody for *Miranda* purposes. The interaction between the police officers and Frink, at the time Frink permitted the searches, had lasted only a few minutes; the police officers had not drawn their weapons or restrained Frink; Frink was at a place of his own choosing, his own car; though the police were questioning Frink as a suspect, Frink testified that he did not realize he was a suspect until he was questioned at police headquarters.

confessed] . . ., the Court has assessed the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation. Some of the factors taken into account have included the youth of the accused, his lack of education, or his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep. In all of these cases, the Court determined the factual circumstances surrounding the confession, assessed the psychological impact on the accused, and evaluated the legal significance of how the accused reacted.

. . . . .

. . . [We] agree with the courts of California that the question whether a consent to a search was in fact "voluntary" or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances.

412 U.S. at 226–27, 93 S.Ct. at 2047–2048, 36 L.Ed.2d at 862–63 (footnote and citations omitted).[26]

▇▇▇ The record clearly supports the trial court's conclusion that Frink voluntarily consented to the search. Though the police did not specifically tell Frink that he had the right to refuse their request, they did nothing to indicate that he had to comply with their request and the totality of circumstances surrounding the search does not suggest Frink consented because his will was overborne. Frink was a thirty-eight year old, intelligent, successful businessperson. The police questioned him for only a few minutes, and he immediately complied with their requests. Frink himself testified at the suppression hearing a number of times that he gave permission for the searches.

A. Hogan appeared to be in charge and *he asked permission to search the car, which I granted.*

Q. Had—what had he communicated to you prior to that?

A. Just who he was, said he was a police officer.

Q. Did you have information at that time as to why they were questioning you? Had they communicated anything to you at that time?

A. No.

Q. And what occurred then?

A. *Well, I don't remember the exact language but I said, yes, they could search the car for anything they wanted.*

Q. And did you know what they wanted?

A. No.

Q. And what did they do at that point?

A. Hogan, I believe, was the one who search—excuse me—was the one who searched it. He looked in the glove compartment first and then he searched the rear of the car and removed the 2 spent shotgun shells. There were several other shells back there—he didn't seem interested in those—from a rifle and a pistol I have.

. . . . .

Q. After that, what else did he inspect?

A. Then he asked for the keys and I unlocked the trunk. He went through that.

. . . . .

Q. *And you did give them permission to look around your car?*

A. Yes, sir. [emphasis added] [27]

**26.** *Schneckloth* involved a noncustodial consent search. 412 U.S. at 240 n.29, 93 S.Ct. at 2055 n.29, 36 L.Ed.2d at 870 n.29.

**27.** Frink testified that he was not advised of his *Miranda* rights until he arrived at the police station, Frink stated, however, that in his prior encounters with the police, he had been warned of his *Miranda* rights. He recalled specifically being informed of his rights on one occasion, and he assumed (he was apparently drunk at the time) on another occasion that he had been advised of his rights.

Even after his lawyer arrived and Frink was specifically advised of his *Miranda* rights and his right to refuse to consent to a search, Frink signed a release form, consenting to a further search of his car. Frink testified at trial that he permitted the searches because he had nothing to hide: "I didn't have any reason not to. There wasn't anything back there that I didn't want him to see." The court's statement in *United States v. Smith*, 308 F.2d 657, 663 (2d Cir. 1962), *cert. denied*, 372 U.S. 906, 83 S.Ct. 717, 9 L.Ed.2d 716 (1963), is relevant here:

> On the [one] hand, if the defendant permits a warrantless search of his home or establishment in the mistaken belief that he has nothing there which will incriminate him, it has been held that the search has been voluntarily consented to.[28]

 Frink implicitly admits the record supports a finding of voluntariness under *Schneckloth* but argues that Alaska's guarantee against unreasonable searches and seizures requires a different consent standard.[29] Frink argues that the state, to show consent, must specifically prove that he knew of his right to refuse to allow the search. The Court in *Schneckloth* rejected

that argument,[30] and we do not believe that the Alaska Constitution requires a different standard for noncustodial consent searches.

## IV. EVIDENTIARY RULINGS AT TRIAL

As with the grand jury testimony, Frink has withdrawn his objection to testimony by Karen Check, Carol Krizan and Bill Hodgson about threats Frink made against persons who were the object of Check's affection. We are left with two alleged errors.

### A. The Palmer Incident.

Frink contends that testimony relating to an incident in Palmer between Frink and Karen Check's then husband, Robert Check, was improperly permitted. The incident led to Frink's conviction for careless use of a firearm. We summarized the testimony in our recitation of the facts.

 Evidence of prior crimes is generally inadmissible to show bad character of the accused,[31] but is admissible if it is relevant to a material fact in the case at trial and if its probative value outweighs its prejudicial impact. *Eubanks v. State*, 516

The defendant's prior experience with the criminal justice system is relevant as one factor to be weighed in the totality of circumstances. We believe, however, the fact that a defendant has received *Miranda* warnings in his previous encounters with the law is rather weak circumstantial evidence of the voluntary character of a later consent to search. In *Sleziak v. State*, 454 P.2d 252, 259–60 (Alaska), *cert. denied*, 396 U.S. 921, 90 S.Ct. 252, 24 L.Ed.2d 202 (1969), we held that the defendant's receipt of *Miranda* warnings put the defendant on notice that he did not have to talk to the police, and that he could see a lawyer. We found the fact of *Miranda* warnings critical in finding that the defendant voluntarily consented to the search. *Id.* The warnings in *Sleziak*, however, were given in connection with the same investigation, immediately prior to defendant's consent to the search.

28. *Quoted in Sleziak v. State*, 454 P.2d at 257.

29. Article I, section 14 of the Alaska Constitution provides:

> *Searches and Seizures.* The right of the people to be secure in their persons, houses and other property, papers, and effects,

against unreasonable searches and seizures, shall not be violated. No warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The fourth amendment to the United States Constitution is almost identically worded.

30. [T]he question whether a consent to a search was in fact "voluntary" or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances. While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the sine qua non of an effective consent.

412 U.S. at 227, 93 S.Ct. at 2048, 36 L.Ed.2d at 862–63.

31. When the accused introduces evidence of his good character, different considerations may be involved. *See* McCormick on Evidence § 191 at 454–59 (2d ed. 1972).

P.2d 726, 729 (Alaska 1973). McCormick on Evidence § 190 at 447–54 (2d ed. 1972). We agree with the state that this evidence was relevant to the issue of defendant's motive for allegedly taking Hillier's life, and also was probative of the defendant's state of mind toward Hillier. Robert Check was a member of the class of persons to which Hillier belonged, that is, persons with whom Check was romantically involved. The determination of whether the probative value of a piece of evidence outweighs its prejudicial impact is initially committed to the discretion of the trial judge, and we review the judge's evidentiary rulings for abuse of discretion. *Poulin v. Zartman,* 542 P.2d 251, 260 (Alaska 1975); *Courtney v. Courtney,* 542 P.2d 164, 167 (Alaska 1975). We find no abuse in admission of evidence relating to the Palmer incident.

■ Frink goes on to argue that if admission of evidence about the incident was not error, only such details that were relevant to prove the particular point, Frink's motive, should have been presented to the jury. *See People v. King,* 276 Ill. 138, 114 N.E. 601 (1916).[32] While Frink requested the trial judge to issue a protective order against the prosecution's mention of the incident, he did not at any time ask that the presentation, if allowed, be limited. Thus, the defendant has waived this point on appeal. *E. g., University of Alaska v. Simpson Building Supply Co.,* 530 P.2d 1317, 1324 (Alaska 1975).

■ The defendant further contends that the trial court should have given an instruction limiting the juror's use of the Palmer incident testimony. The defendant did not request such an instruction at trial and therefore has waived his claim. *E. g., City of Nome v. Ailak,* 570 P.2d 162, 171 (Alaska 1977).[33]

**32.** Frink argues that details such as that a shot was fired near Mr. Check's foot to get his attention, that Check turned his back on Frink and was walking toward his house when a shot was fired, that a bullet hole was found in the bathroom, and that a particular caliber of pistol was used were irrelevant to establishing motive.

**33.** Defendant does not argue, and the record does not indicate to us, that either of these

### B. The Carson-Trudeau Incident.

■ The testimony of Belinda Carson was admitted over objection of the defendant. We summarize the incident with Carson and her testimony.

Two days before the trial, Belinda Carson, a sixteen-year-old admitted prostitute, met Frink in a bar. The two arranged to go to her motel room. Upon arriving at the room, Frink found Carson's boyfriend hidden in the closet. Frink believed that he was being set up to be "rolled" and left the room. He remained at the motel and observed Carson leave the motel in a cab. Frink called the police, and Vice Officer Trudeau came to the motel. Frink was apparently concerned that someone else would be rolled that night if Carson was not apprehended. Frink rode with Officer Trudeau back downtown and went into bars in an effort to locate and apprehend Carson. Carson was apprehended and turned over to the juvenile authorities. Her boyfriend was never located.

Carson was allowed to testify to these events, including that she had telephoned her boyfriend and arranged that he be present at the motel room because Frink told her, "[Y]ou better not fuck with me because I'm going to court for first degree murder." Carson also testified that when Frink found her boyfriend, Frink

left the room. He was upset, and he told me that I had made a mistake and he left.

. . . . .

. . . [H]e was mentioning things about, I had better leave town. He was pretty mad.

claims represent plain error within the meaning of Criminal Rule 47(b), which provides:

*Plain Error.* Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.

We find plain error only if the alleged error is likely to result in a miscarriage of justice. *E. g., Holiday Inns of America, Inc. v. Peck,* 520 P.2d 87, 91 (Alaska 1974).

Carson was also asked what she had said to Frink about the murder trial on their way to the motel room:

> I asked him what happened, and if he'd —I asked him—okay, I asked how he was involved in it, and he said that a girlfriend of his—[a boyfriend of his ex-girlfriend] was shot and I asked him if he did it and—and he said—asked me what—what I thought, and then he told me he was going to beat the case.

Officer Trudeau testified to these events and stated that while riding with Frink, Frink brought up the topic of his upcoming trial and said, "I'm the guy that blew the guy in 2 on Government Hill." Trudeau also testified that Frink, in explaining the facts of the homicide, said: "[Y]ou don't see me shedding any tears do you?"

Frink moved below for a protective order against Carson's testimony. The trial judge refused, stating:

> Two observations, one is that this [the contact between Officer Trudeau and Frink] was not engineered in any way by the police, and the jury is entitled to know that. The second is that the—she—he did make some statements to Miss Carson which were related to the facts on trial in this case, and in addition the jury is entitled to—in order for—or the state is entitled to present the entire circumstances in order to show the credibility of Officer Trudeau.

We find the prejudicial impact of Carson's testimony outweighed its probative value and therefore its admission was an abuse of discretion. *See, e.g., Poulin v. Zartman,* 542 P.2d 251, 260 (Alaska 1975) (articulating the standard). The prejudicial impact of Carson's testimony was its suggestion that the defendant was a violent man who had relations with a young prostitute. The threat made against Carson had no probative value; it was not relevant to Frink's motive to kill Hillier because Carson was not in the same class of persons as

Hillier. Furthermore, we have grave doubts that Frink's statement to Carson that he was going "to beat the case" was relevant. The theory of relevancy would be that someone who said they were going "to beat the case" was more likely to have committed the offense than someone who did not utter the words. Nevertheless, the prejudicial impact of Carson's testimony clearly outweighs whatever marginal relevance Frink's statement may have had.

■ Although admission of the evidence was error, we find it harmless error. Alaska R.Crim.P. 47(a). The standard for harmless error is whether we can "fairly say that the [inadmissible] evidence did not appreciably affect the jury's verdict." *Love v. State,* 457 P.2d 622, 632 (Alaska 1969).[34] The improper significance that the jury attached to Carson's testimony was probably slight. The court specifically instructed the jury that they could not consider the threats related by Carson "as tending to show a propensity [of Frink] toward violence or toward making threats," and the jury had before it much admissible evidence about threats Frink had made to other persons.

We think that Frink's statement to Officer Trudeau was highly probative and correctly admitted. We agree with the trial court that there was need of some background details to support the credibility of Trudeau's testimony and to explain how Frink came in contact with Trudeau.[35] But Carson's testimony was not necessary for that. Trudeau could have testified that Frink reported a crime, unrelated to the homicide, and that they were looking for the perpetrator of the crime.

AFFIRMED.

---

**34.** This is the standard for errors that do not implicate a defendant's constitutional rights. *Love v. State,* 457 P.2d at 632–34.

**35.** Trudeau would not have to testify to Carson's age or to the other details such as Carson's boyfriend hiding in the closet.