**Pedro CASTILLO, Appellant,**

**v.**

**STATE of Alaska, Appellee.**

**No. A–3429.**

Court of Appeals of Alaska.

Nov. 15, 1991.

---

Rex Lamont Butler, Anchorage, for appellant.

Nancy R. Simel, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Charles E. Cole, Atty. Gen., Juneau, for appellee.

## OPINION

Before BRYNER, C.J., COATS, J., and ANDREWS, Superior Court Judge.*

COATS, Judge.

Pedro Castillo was convicted, following a jury trial, of misconduct involving a controlled substance in the third degree, a class B felony. AS 11.71.030(a)(1). Castillo appeals, raising several issues. We reverse Castillo's conviction.

In October 1988 Dora Sosa met with Vittorio Badoino and Pedro Castillo in her home. Dora Sosa testified at trial that while Castillo waited in the living room, she went into the kitchen with Badoino. Dora Sosa attested that Badoino offered to pay $200 in exchange for each package she would receive for him. In a prior statement to the police, however, she stated that Castillo had asked her to receive the packages.

Dora Sosa received six packages from New York or New Jersey between October 1988 and July 1989. She testified that as far as she knew, Castillo sent these packages. Before a package would arrive, Mercedes Sosa, Castillo's girlfriend and Dora Sosa's cousin, would call Dora to tell her to expect a package. Dora thought that Castillo called Mercedes to tell her a package was coming. Two of the packages were sent to Dora Sosa's residence; Badoino would wait outside until the mail arrived, then would pick up the package from Dora Sosa and pay her $200. Four packages were sent to Dora Sosa's place of employment, Electrical Distributors Incorporated (EDI). After a package arrived at EDI, Dora would call Mercedes or Badoino and one of them would drive to the parking lot behind EDI and pick up the package.

Wes Stoecker, Dora Sosa's boss and the president of EDI, noticed that a number of packages had come to EDI addressed to Dora Sosa personally. He also noticed that after each package arrived, she would make a phone call and the unopened package would be picked up in the parking lot. Stoecker suspected that the packages contained drugs, and called the police to report his suspicions. He met with Officer Wilbur Hooks, and they agreed that Stoecker would intercept the next package to arrive.

On July 28, 1989, Stoecker intercepted a package sent to EDI from New York, addressed to Dora Sosa. Stoecker brought the package to the police station, where it was subjected to a canine sniff. The dog alerted, indicating that the package contained drugs.

Stoecker, Hooks, and two state troopers confronted Dora Sosa in Stoecker's office. Dora Sosa acknowledged that the package was hers and said she had ordered some glassware from New York. She agreed to

---

* Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

open the package. The package contained a set of pots; inside the largest of the pots was a kilogram of cocaine. After speaking privately with Stoecker, Dora Sosa agreed to cooperate with the police.

On July 29, Dora Sosa gave Hooks a statement concerning the source of the cocaine and what she did with the packages after receiving them. She stated that the drugs were sent from New York, by Castillo, and that he often came to Alaska shortly after the drugs arrived. At trial she testified that she had agreed to cooperate and to give her statement because the police told her that otherwise she could spend twenty years in jail. The police obtained a warrant authorizing the electronic monitoring and recording of conversations between Dora Sosa, Mercedes Sosa, Vittorio Badoino, and Pedro Castillo.

Over the next few days, the police attempted to have Dora Sosa deliver the package to Badoino. The original plan was for Dora Sosa to contact Mercedes Sosa, and have Mercedes send Badoino to pick up the package. Badoino and Castillo were in New York, and did not return to Anchorage until late on July 30.

On August 1, Mercedes Sosa told Dora to deliver the package to a cousin, Angela Sotos, on Sixth Avenue, where Badoino would pick it up. Neither Badoino nor Castillo were present at the residence when Dora Sosa arrived; the police had instructed her not to deliver the package, or take it out of her car, if those two individuals were not present.

Dora Sosa spoke to Mercedes and Castillo later that evening. Castillo told Dora to bring the package over to Mercedes' apartment, and Badoino would later pick it up. Mercedes said she did not want the package in her home, and told Dora to leave the package in a closet outside the apartment. The police did not want the package left in the closet, because someone could remove it without being seen. By arrangement, as Dora Sosa was driving to Mercedes' apartment, she was pulled over by a marked police car for having expired registration tags. Dora Sosa then drove away without leaving the package in the closet.

Dora Sosa then called Mercedes' residence from the Royal Fork Restaurant, and spoke with Castillo. Castillo told her that "we" would come and get the package from her. Mercedes came to the parking lot and told Dora to follow her to Sotos' residence. As they were leaving the parking lot, they were stopped by the police and taken to the Anchorage Police Department. Mercedes was told that if she did not cooperate, her children would be taken away, she would go to jail for twenty years, and she would be deported. Mercedes agreed to cooperate with the police.

Early on the morning of August 2, Dora Sosa and Mercedes Sosa returned to Mercedes' apartment with the package. The police were waiting outside in the hallway of the building. Castillo was in the apartment, sitting with his and Mercedes' baby. Castillo looked upset when they entered the apartment, and asked Mercedes what had taken her so long. Dora was carrying the cocaine, and said to Castillo, "Here's [Badoino's] stuff." Castillo motioned to a table in the living room; Dora put the package on the table. Castillo motioned towards money on the table, but Dora left without taking the money.

After Dora Sosa left the apartment, the police entered and served a search warrant. Castillo was on the telephone, and the cocaine and $200 were on the living room table. Castillo was convicted based upon this evidence.

■ Castillo argues that he was deprived of his right to a unanimous verdict on the crime which he allegedly committed. We agree with Castillo. It is necessary for us to discuss a certain amount of background information in order to explain our decision.

Before closing arguments, the state sought a ruling from the court whether under *State v. James*, 698 P.2d 1161 (Alaska 1985), and *Ward v. State*, 758 P.2d 87 (Alaska 1988), the state could argue that Castillo was guilty as either an accomplice or a principal, and whether the jury needed to decide between these two theories in order to find Castillo guilty. Castillo ob-

jected on the grounds that there was no evidence of accomplice liability; the court overruled the objection.

In opening statement, the state asserted that the evidence would show that Castillo either possessed the cocaine or aided and abetted Badoino. The state argued in closing argument that Castillo could be found guilty as a principal, for either actual or constructive possession of the cocaine, or he could be found guilty as an accomplice to Dora Sosa's or Vittorio Badoino's possession.

In its brief on appeal the state summarizes the particular theories under which it contends the jury could have found Castillo guilty at trial:

Castillo could be found guilty based on his having knowingly taken control of approximately one kilogram of cocaine, by directing Dora Sosa to receive the package he had sent to her, to bring the package to him, and to place the package of cocaine on the living room table in Mercedes Sosa's apartment. Alternatively, Castillo could be found guilty of constructive possession for having sent the cocaine into the state of Alaska with the intent that it be delivered to Dora Sosa and then to Badoino. Castillo could also be found guilty as an accomplice of Dora Sosa based on his having sent the cocaine to her and having arranged for her to deliver it to either Badoino or himself.

During jury deliberation, the jurors submitted a note asking whether they needed to be unanimous as to whether Castillo was guilty as an accomplice or a principal. At that time, Castillo again objected to the accomplice liability theory, and asked for a limiting instruction. In particular, Castillo objected on the ground that the jury might find him guilty for conduct which took place in New York. The trial court refused to give a limiting instruction. Castillo also requested a special verdict form which would require the jury to state "whom he's an accomplice of." In response to the jury note, the trial court gave the following instruction:

Your verdict must be unanimous. All twelve must agree on the verdict. For example, if 6 of the jurors agree the defendant was guilty of the crime charged in the indictment and 6 agree the defendant was legally accountable for the conduct of another person who committed the offence [sic] of misconduct involving a controlled substance in the third degree, on or about August 2, 1989, then your verdict would be guilty.

On the other hand, if all twelve agree that the defendant was neither guilty of the crime charged in the indictment, nor was legally accountable for the conduct of another person who committed the offense of misconduct involving a controlled substance in the third degree on or about August 2, 1989, then your verdict would be not guilty.

The verdict form you have been given is the only verdict form you need to express a unanimous verdict.

The leading Alaska cases which discuss the extent to which jury verdicts must be unanimous are *State v. James*, 698 P.2d 1161 (Alaska 1985), and *Ward v. State*, 758 P.2d 87 (Alaska 1988).

In *James*, the jury was instructed that it could find the defendant guilty of first-degree assault under either AS 11.41.-200(a)(1) (recklessly causing serious injury by means of a dangerous instrument) or AS 11.41.200(a)(3) (knowingly engaging in conduct that results in serious injury under circumstances manifesting extreme indifference to the value of human life). The defendant was convicted under a general verdict of guilty. On appeal, the supreme court considered whether the defendant was entitled to a unanimous jury verdict on a particular theory of the crime charged.

The court held that a jury need be unanimous only "in its conclusion that the defendant committed a single offense described in the statute." *James*, 698 P.2d at 1165. The court noted that there was only one criminal act alleged, and only one incident involved. *Id.* at 1166. The court specifically stated that the unanimity requirement is met if the jury can agree on "just what the defendant did." *Id.* at 1167. The court

went on to distinguish *James* from a case in which a general verdict, when there are two different theories for criminal liability, would be insufficient: "[T]he case before us does not present a situation in which jurors might have split over whether the defendant committed a single criminal act; in such a case it might well be necessary to require unanimity upon the *actus reus* element." *Id.*

The supreme court again discussed the unanimity requirement in *Ward.* In that case, the jury was instructed that it could find the defendant guilty of driving while intoxicated either by finding that he was driving under the influence of intoxicating alcohol, or by proof that his breath alcohol level exceeded the legal limit. *Ward*, 758 P.2d at 88; AS 28.35.030(a)(1) and (a)(2). The jury convicted him under a general verdict.

On appeal, Ward argued that the jury should have been required to be unanimous as to its theory of guilt. The court held that because the two statutory sections "describe merely different theories by which a person may be shown to have driven while intoxicated, it was not necessary that the jury agree unanimously upon the theory by which Ward violated the statute." *Ward*, 758 P.2d at 92. The court also noted that the conduct prohibited by the two sections is similar; an offender will frequently have violated both sections by drinking alcohol. *Id.*

In both *James* and *Ward*, the defendant was charged with violating two alternative sections of the same statute. The supreme court noted in both cases that in determining whether a defendant can be convicted under a general verdict when the theories of liability differ, it is important that both theories describe the same criminal act or incident.

In the instant case, the state's different theories of liability described different criminal acts. In closing argument, the prosecutor argued that Castillo could be found guilty of actual or constructive possession for telling Dora Sosa over the telephone to bring the "stuff" to Mercedes' apartment, and then gesturing toward the money. The state argued that under the same facts, Castillo could be found guilty as an accomplice.

However, the state also argued that the jury could find Castillo guilty under a different set of facts. The prosecutor argued that Castillo could be found guilty as an accomplice for initially telling Dora Sosa that she would get $200 for each package, thereby aiding Badoino in planning or committing the offense. This theory echoed the prosecutor's opening statement that the evidence would show that Castillo aided and abetted Badoino. This does not describe a different theory by which the jury could find Castillo guilty of the same criminal act. *Ward*, 758 P.2d at 92. Rather, this describes a different criminal event. The jury might have found that, based upon the agreement to pay Dora Sosa for receipt of the package, Castillo was guilty of aiding and abetting the delivery of the July 28 package.

Because the prosecution presented different theories to the jury which described different criminal events, it is unclear whether the jury agreed on "just what the defendant did." *James*, 698 P.2d at 1167. The jurors may have split on the criminal act of which Castillo was guilty—six may have found that he was guilty of actual possession for directing Dora Sosa to place the package on the table, while the other six may have found him guilty as an accomplice for planning with Badoino to send the packages from New York and pay Dora Sosa for receipt and delivery.

Therefore, because the jurors may have found Castillo guilty based on different criminal acts, a general verdict form was insufficient. We conclude that Castillo was deprived of his right to a unanimous verdict on what criminal act he committed. We reverse Castillo's conviction.

 Castillo raises several other issues which may be disposed of summarily. Castillo contends that the case against him should be dismissed because he was entrapped. Alaska has an objective approach for determining whether entrapment has occurred. *Grossman v. State*, 457 P.2d 226, 229 (Alaska 1969). Under the objec-

tive test the question for the trial court is whether the police conduct "falls below an acceptable standard for the fair and honorable administration of justice." *Pascu v. State*, 577 P.2d 1064, 1067 (Alaska 1978). Entrapment is an affirmative defense. AS 11.81.450. Castillo therefore had the burden of proving the defense by a preponderance of the evidence. AS 11.81.900(b)(1). We conclude that the trial court did not err in finding that Castillo had not established that the police conduct fell below the acceptable standard. The trial court also did not err in refusing to dismiss the indictment on this ground. Entrapment is an affirmative defense and is a question for the court. The prosecution had no duty to present Castillo's entrapment case to the grand jury. *See Frink v. State*, 597 P.2d 154, 164–66 (Alaska 1979).

■ Castillo next argues that there was insufficient evidence presented to the grand jury to establish a criminal offense. We conclude that the trial court did not err in finding that the state presented sufficient evidence to the grand jury to indict Castillo for possession of cocaine for the purpose of distribution. *State v. Parks*, 437 P.2d 642, 644 (Alaska 1968) (a court reviewing a claim that the evidence presented at grand jury was inadequate to support the charge must determine whether the evidence gave a sufficiently detailed account of the offense charged so that if unexplained or uncontradicted it would warrant conviction for the offense).

Castillo next argues that his indictment was based on the testimony of Dora Sosa, and that her statements linking him to the package were based on hearsay and specu-lation. We conclude that the trial court did not err in refusing to dismiss the indictment against Castillo on this ground.

■ Castillo next argues that Dora Sosa's grand jury testimony concerning her receipt of other packages, which were allegedly sent by Castillo, constituted inadmissable prior bad act evidence. We conclude that the trial court did not err in determining that this evidence was more probative than prejudicial. *See* A.R.E. 404(b) and A.R.E. 403.

■ Castillo next argues that there was insufficient evidence presented to the grand jury to prove that he possessed the cocaine in the state of Alaska. He argues that if the only evidence against him was that he sent cocaine to Dora Sosa from New York, the trial court should have dismissed the case for lack of subject matter jurisdiction. We conclude that the trial court did not err in determining that there was sufficient evidence to prove that Castillo was in possession of cocaine in Alaska.

Castillo next argues that there was cumulative error. We do not find cumulative error. Since Castillo is receiving a new trial, we find it unnecessary to address the other issues which he raises.

The conviction is REVERSED.

MANNHEIMER, J., not participating.