**Bobby DOISHER, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. 4369.**

Court of Appeals of Alaska.

July 9, 1981.

---

Walter L. Carpeneti, Juneau, and Bobby Doisher, pro se, for appellant.

David Mannheimer, Asst. Atty. Gen., Anchorage, and Avrum M. Gross, Atty. Gen., Juneau, for appellee.

Before COATS and SINGLETON, JJ., and HANSON, Superior Court Judge.

## OPINION

COATS, Judge.

On May 17, 1977, the body of Anita Frances (Sherry) Stewart was found on an isolated country road about fifty miles from Anchorage. She had been shot several times by a .45 caliber weapon. State troopers found a shoe print beside the body and took a plaster cast impression.

Several months later, Bobby Doisher was charged with the murder of Sherry Stewart. The case against Doisher will be set forth in more detail as the issues are developed in this opinion.

The basic prosecution theory at Doisher's trial can be summarized as the following: Sherry Stewart was a cocaine dealer. She bought cocaine in large quantities and re-sold it in smaller quantities at a large profit. Stewart's cocaine supplier quit doing business and she needed a replacement. Doisher, according to the prosecution, offered to obtain a supply of cocaine for her. On May 17, 1977, Sherry Stewart, with several thousand dollars in her possession which she was doing to use to purchase cocaine, met Doisher. According to the prosecution, Doisher shot Sherry Stewart for the money.

Doisher was convicted of felony murder (robbery) in violation of former AS 11.15.-010. He was sentenced to serve a term of forty-five years. Doisher appeals to this court raising numerous points.

### THE SEARCH WARRANT

Doisher filed a pretrial motion asking the trial court to suppress evidence which the troopers seized from his residence pursuant to a search warrant. The troopers found shoes at Doisher's residence which a state expert witness, John Sauve, testified were probably the same shoes which made the print found beside Sherry Stewart's body.[1]

Doisher contends that the evidence before the magistrate was not sufficient to establish probable cause because the hearsay testimony of a police informant, Thomas Mooney, was not sufficiently corroborated. In addition, he claims this court should notice as plain error alleged misstatements which the trooper made at the hearing to obtain the search warrant. Doisher argues that

the warrant was obtained because of these misstatements and should therefore be invalidated.

### A. PROBABLE CAUSE TO OBTAIN THE SEARCH WARRANT

The sole testimony before the magistrate who issued the warrant was the testimony of trooper Charles Miller. Trooper Miller testified as to his knowledge of the investigation of the murder of Sherry Stewart. However, the major portion of Trooper Miller's testimony concerned information which was given to him by Tom Mooney. Mooney, after he had been arrested for operating a motor vehicle under the influence of alcohol, told the troopers what he knew about Bobby Doisher. At the time of his arrest the troopers also found a trace of cocaine on a spoon in Mooney's possession. Doisher argues that Mooney was motivated to provide information against Doisher in the hope that the troopers would give Mooney favorable consideration on the criminal charges he was facing. He argues that Mooney is therefore a traditional police informant whose testimony must be corroborated under the United States Supreme Court's decision of *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964).[2]

When Doisher brought his motion to suppress in the trial court, the trial court found that Mooney was adequately corroborated.[3] We agree. We need not reach the issue of whether Mooney should be regarded as a police informant since, even if he was, he was adequately corroborated.

According to Trooper Miller's testimony at the hearing to obtain the search warrant, Thomas Mooney told the troopers why he suspected Bobby Doisher of murdering Sherry Stewart. The following state-

---

1. A defense expert witness, Bart Reid, testified that the shoes seized at Doisher's residence were probabiy not the shoes which made the print beside Sherry Stewart's body.

2. A citizen informant who reports a crime or gives other information to the police is afforded greater credibility than a traditional police informant, who is usually a criminal himself and

is frequently motivated by concessions from the police or by revenge. *Erickson v. State*, 507 P.2d 508, 517 (Alaska 1973).

3. The trial court also found Mooney was not motivated by a prior promise of immunity from the prosecution.

ments summarize Trooper Miller's testimony about Mooney's statements concerning Doisher. Mooney told Miller he was in a position to know about Doisher and Stewart since he knew both of them, and lived in the same apartment building as Doisher. Mooney indicated Sherry Stewart was a cocaine dealer who was trying to buy a large amount of cocaine. Mooney was present when Doisher told Sherry Stewart he could possibly arrange a large sale of cocaine. On May 14, 1977, Doisher told Mooney the cocaine for Stewart would be available on May 17, 1977, which was the day Sherry Stewart was shot. Also on May 14, Mooney talked to Doisher about how easy it would be to rob Stewart and take her money. Mooney indicated that shortly after Sherry Stewart's death, Doisher paid off a loan on an automobile and purchased a pick-up truck, along with other large purchases. Mooney told Miller that before Sherry Stewart's death Bobby Doisher did not have much money. He stated that both he and Doisher were unemployed and made trips to the union hall together. Mooney said he saw Doisher's .45 caliber pistol and ammunition. He stated that the only shoes that he had ever seen Doisher wear were earth shoes [4] and tennis shoes.

Trooper Miller also testified before the magistrate concerning the results of his own investigation, and his knowledge of the murder of Sherry Stewart. Trooper Miller found from records that Doisher had made a $2,000 down payment on a pick-up truck, and that he had paid $500 on a car loan shortly after Stewart's murder. Miller stated that the records showed both payments were made in cash. He testified that Sherry Stewart had been shot with a .45 caliber weapon, and that the plaster cast and photos of the print the police found next to Sherry Stewart's body indicated that the print had been made by a shoe similar to an earth shoe.

We hold that the magistrate was correct in finding probable cause to search upon these facts. The first requirement of *Aguilar* is that the informant must demonstrate a reliable basis for his testimony. The informant must not be merely reporting street rumors or other unreliable information. In this case Mooney claimed firsthand knowledge of all the facts before the magistrate. He therefore clearly meets the first test of *Aguilar*.

The second requirement of *Aguilar* is that the magistrate must be given some basis to conclude that the informant is himself reliable. This is usually done by a police officer indicating that the informant has been reliable in the past. However, an informant's statements may be verified by independent corroboration of the incriminating facts. *Davis v. State*, 499 P.2d 1025, 1029 (Alaska 1972), *rev'd on other grounds, Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); *See also Schmid v. State*, 615 P.2d 565, 574–77 (Alaska 1980). Here the police corroborated the fact that Doisher made large cash purchases shortly after Sherry Stewart was killed. Mooney's statement that Doisher owned a .45 caliber automatic was corroborated by information known to the police that Stewart had been killed with a .45 caliber weapon. Mooney's statement about Doisher's shoes also was consistent with what the police knew about the murder. We find the testimony of Tom Mooney adequately corroborated under *Aguilar*.[5]

### B. ALLEGED MISSTATEMENTS OF FACTS

■ Doisher argues that the search warrant was invalid because it was based upon misstatements of facts to the magistrate. He argues that the magistrate was not informed that Mooney was the person who brought up the subject that Sherry

---

4. An earth shoe has a heel lower than its sole, and is wide at the toe.

5. The information that Thomas Mooney had been arrested for operating a motor vehicle under the influence of alcohol and may have been in possession of a trace of cocaine was not before the magistrate. We find that this information, had it been placed before the magistrate, would not have caused him to deny the search warrant. *See State v. Davenport*, 510 P.2d 78, 82 (Alaska 1973).

Stewart could be easily robbed. Doisher also argues that the magistrate was never informed that Mooney originally told the police that Doisher owned a .38 caliber automatic, not a .45 caliber automatic. Doisher points out that the record suggests that Mooney became convinced Doisher owned a .45 caliber automatic only after the police had incorrectly told Mooney there was no such weapon as a .38 caliber automatic.

These contentions were never raised in the trial court. Doisher therefore asks us to notice these contentions as plain error. An appellant who raises plain error "must shoulder the heavy burden of demonstrating the alleged misconduct raises a substantial and important question." *Garroutte v. State*, 508 P.2d 1190, 1191 (Alaska 1973). The appellant must also show the error was "obviously prejudicial." *Kugzruk v. State*, 436 P.2d 962, 964 (Alaska 1968).[6]

The Alaska Supreme Court has ruled courts must examine misstatements of fact which are used to obtain a warrant.[7] The court in *Davenport v. State*, 510 P.2d 78, 82 (Alaska 1973), said:

> We believe that since search warrants issue *ex parte*, the courts must be willing to investigate the truthfulness of the material allegations of the underlying affidavit in order to protect against the issuance of search warrants based on conjured assertions of probable cause. Thus, we believe that challenges to the search warrant and affidavit may be properly entertained during the suppression hearing.
>
> However, in order for a misstatement of fact in an affidavit to fatally impair the validity of a search warrant, the misstatement must be material to the showing of probable cause upon which the warrant is based. In the case before us,

it does not appear that the district judge was influenced by the misstatements in the affidavit to issue a search warrant which he would otherwise have denied.

We hold that the failure to present the fact that Mooney was the person who originally told Doisher Sherry Stewart could be easily robbed was not material. At the hearing on the application for the search warrant, Trooper Miller merely indicated the conversation took place between Mooney and Doisher. Whether Mooney first brought up the subject or whether Doisher did so is not information which would materially influence the magistrate. The important point is that Mooney and Doisher had this conversation shortly before Sherry Stewart was murdered.

■ We now deal with Doisher's argument that Trooper Miller misled the magistrate because he did not tell the magistrate that Mooney originally identified Doisher's pistol as a .38 automatic. The record reflects, however, that the police and Mooney both confirmed that the weapon was a .45 caliber automatic. On September 6, 1977, before the search warrant application was made,[8] Mooney, accompanied by an undercover trooper, Charles Hagans, tried to borrow the .45 from Doisher. Doisher, according to the trooper and Mooney, looked shocked when Mooney asked to borrow the .45 caliber weapon. Doisher stated that he had sold the .45 caliber automatic.[9] Therefore, based upon the record, it appears that Mooney and the troopers confirmed, before the search warrant hearing, that the weapon he described was indeed a .45 caliber automatic. There is certainly no showing of an intentionally falsified statement.[10] Trooper Miller simply did not give the magistrate the complete history of how Mooney became convinced that the weapon Doisher

---

6. *See also Moreau v. State*, 588 P.2d 275, 280 (Alaska 1978). The supreme court in *Moreau* also indicated reluctance to notice as plain error matters which raised the exclusionary rule.

7. The United States Supreme Court has also spoken on this issue in *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

8. The application for search warrant was made on September 14, 1977.

9. At the search warrant hearing the trooper told the magistrate that Doisher denied owning a weapon.

10. *See Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

owned was a .45 caliber automatic. To the extent this can be characterized as a misstatement to the magistrate we hold it was not material. It most certainly does not rise to the level of plain error.

## GRAND JURY

Before trial, Doisher moved to dismiss the indictment against him. The trial court ruled that Doisher had been properly indicted. We agree with the trial court's decision. We will discuss Doisher's allegations one at a time.

■ Doisher first argues that the state should have presented testimony of William Rezac, a person who knew Sherry Stewart and saw her early on the morning of her death. The trial court ruled on this point as follows:

Rezac claims to have seen the [victim] at 8:00 in the morning on the day of her death. The victim was later known to have entered her safety deposit box at 11:30 later that morning. This court fails to see the relevancy of the [victim] being seen alive at 8:00 in the morning by Mr. Rezac and wholly fails to see the exculpatory nature of this evidence.

We agree with the trial court's analysis. The Supreme Court of Alaska in *Frink v. State*, 597 P.2d 154, 165–66 (Alaska 1979), interpreted Alaska R.Crim.P. 6(q) as requiring prosecutors to tell the grand jury about evidence which the prosecutor knows will tend to negate guilt. However, the court explained:

[T]he prosecutor's obligation to present exculpatory evidence to the grand jury does not turn the prosecutor into a defense attorney; the prosecutor does not have to develop evidence for the defendant and present every lead possibly favorable to the defendant.

*Frink*, 597 P.2d at 166. Rezac's testimony clearly was not material enough to require the prosecution to present it to the grand jury under the test set forth in *Frink*.

■ Doisher also argues that the absence of his fingerprints on Sherry Stewart's purse should have been brought to the attention of the grand jury. Stewart's bloodstained purse was found away from the scene of the murder, and was probably carried from the scene by the murderer. However, the purse did not have anyone's fingerprints on it, even though it was handled extensively by the people who found the purse. This merely indicates the purse was a poor surface for fingerprints. Failure to introduce evidence of the lack of fingerprints on the purse does not rise to the test set forth in *Frink*, that of suppressing evidence which would tend to negate guilt.

■ Doisher contends that the prosecution withheld evidence that Doisher owed money to a prosecution witness, Timothy Nix, and that Nix was in custody for a criminal charge at the time he testified. Doisher claims these factors should have been told to the grand jury because they were important to determine Nix's credibility. Doisher also contends that the grand jury attempted to elicit this information from Nix but was prevented from doing do by the prosecution. The Alaska Supreme Court has ruled that not all evidence reflecting on credibility need be introduced in a grand jury proceeding. *Preston v. State*, 615 P.2d 594, 601–03 (Alaska 1980). We find the evidence that Nix owed the defendant money and that he was being held under state charges was not exculpatory information within the meaning of *Frink*. Nix testified that Doisher told him he owned a .45 automatic and threw it in a river because there was "too much heat." This same testimony concerning Doisher's owning a .45 automatic and getting rid of it because there was "too much heat" was also elicited from another witness, Allen Perry. Tom Mooney also testified that Doisher owned a .45 and told him he had gotten rid of it. Charles Hagans, an undercover trooper, testified he was present when Doisher talked to Mooney about the .45 caliber automatic. Of course, each of these witnesses, like most other witnesses, could be questioned for bias on various grounds. However, in the context of this case, we do not find the prosecution had a duty to point

out that Nix was in state custody and that Doisher owed him money.

■ We now deal with Doisher's argument that the prosecutor kept the grand jury from exploring Nix's credibility. The trial court reviewed the record, and concluded that the action of the prosecutor in cutting off grand jury questioning was motivated by a desire to prevent inadmissible hearsay from being introduced in the grand jury proceeding. We have reviewed the record and agree with the trial court's conclusions.

■ Doisher also argues that the prosecutor omitted several statements wherein Doisher denied committing the murder. He argues his denials should have been read to the grand jury. However, one of Doisher's statements that he denied committing the crime was presented to the grand jury. Any additional denials would have been cumulative, and may have prejudiced Doisher, because of requests for counsel in those statements. We find Doisher suffered no prejudice from the failure of the prosecution to introduce the additional statements.

■ Doisher argues that the plaster cast of the footprint found next to Sherry Stewart's body should have been presented to the grand jury. He argues that the cast was in such bad condition that introduction of the cast would have undermined the testimony of state's witnesses who testified to the similarity between one of the shoes found at Doisher's residence and the cast. There is no merit to this contention. The witnesses testified to the deteriorated condition of the cast, and the difficulty of making comparisons with the cast. The grand jury did not ask to see the cast. We find no error.

■ Doisher argues that the prosecutor disallowed a question to a police officer from a grand jury member as to whether there were other suspects in the case. The prosecutor rephrased the question, asking the officer if at the present time he was conducting an ongoing investigation on any other possible suspect. The officer answer-

ed "No" to that question. Doisher has not suggested to us how he was prejudiced by this sequence, or how exculpatory evidence would have been introduced by the officer answering the grand juror's question instead of that posed by the prosecutor. We find no error.

■ Doisher also argues that the prosecutor made a misleading statement to the grand jury which should have led the trial court to dismiss the indictment. Doisher points out that the prosecutor mistakenly said that Doisher admitted being with Sherry Stewart on Tuesday, May 17, 1977, the day of the murder. The testimony of Tom Mooney was that Doisher had told him the cocaine deal was going to happen on Tuesday, May 17. Mooney's testimony was as follows:

Q: So you expect[ed] a cocaine deal to go down on Tuesday?

A: Yes, I did.

Q: And who indicated to you that that's when it was going to happen?

A: Bobby [Doisher].

\* \* \* \* \* \*

Q: Was it your understanding that he was supposed to see Sherry on Tuesday to take care of the cocaine deal?

A: Yes, it was.

The prosecutor's statement in summation was a passing reference to this testimony. The prosecutor said, "Doisher indicates to Tom Mooney that he saw Sherry on Tuesday." The prosecutor's statement would have accurately stated this evidence if he had said, "Doisher indicated to Tom Mooney he was going to see Sherry on Tuesday." However, in the context of the evidence and argument, we do not find this misstatement to be of a sufficient magnitude to require dismissal of the indictment. The prosecutor's statements were not evidence. The grand jury heard Mooney's testimony and could evaluate it. The impact of the prosecutor's statement was minor.

■ Doisher also complains that the prosecutor misled the grand jury by implying that Doisher's name was found on sev-

eral papers in Sherry Stewart's apartment. The name "Bob" and Doisher's phone number were found on a single sheet of paper. This "implication" came from a question which had been asked of Doisher by a police officer when Doisher was interviewed by the police. The officer's question and Doisher's answers were read to the grand jury. The question from the police officer was: "We found your name and your number in several of some papers that Sherry had, okay?" We fail to see how this question from a police officer could be material in this case. The grand jury had been accurately told that the paper found in Sherry's apartment had the name "Bob" and Doisher's phone number on it. We fail to see how the grand jury could be misled, or that the question of the officer in his interview of Doisher could have prejudicial impact.

■ Doisher raises a similar complaint about another "implication" made by the police officer in the same interview. The police officer asked the following questions of Doisher: "You took her money and you opened Ace Automotive. You took her money and you bought stuff for the house." We again fail to see how the fact that the police officer asked these questions of Doisher was material. Other evidence presented to the grand jury indicated that Doisher had spent a large amount of money shortly after Sherry Stewart's death. The officer's questions which were read to the grand jury as part of Doisher's interview could not have had an undue prejudicial impact.

## THE TRIAL TESTIMONY OF ALLAN PERRY, DORA HAUGE, AND CHARLES STEWART

Allan Perry, who was called as a prosecution witness, was a former friend of Bobby Doisher. Perry testified as to a conversation which he had with Doisher. Perry testified that when he asked Doisher if he still had his .45 caliber automatic, Doisher told him he had to get rid of it "because there was too much heat." Perry also testi-

fied that when Doisher spoke about Sherry Stewart's death he made statements like: "Business is business," "A man's got to do what a man's got to do," and "People get out of line, they get stepped on." Perry also testified as follows to a statement Doisher made to him:

> [My] [m]emory is that he said something to the effect that—one of 3 things, either yes, he had been present at the time of the murder or yes, he knew of the murder, or just that she did deserve to die. One of the 3.

Perry was then impeached by the prosecution because in an earlier statement before the grand jury Perry had testified that Doisher told him he was present when Sherry Stewart was killed.

Perry was impeached by the defense on a number of grounds. He had criminal charges pending. The defense suggested that Perry may have been hoping to get a deal from the prosecution. Perry admitted making a statement to a defense investigator which implied he was going to try to act as though he knew more than he did about Doisher's case in order to obtain concessions from the prosecution:

> I figured what I knew about Bobby [Doisher] isn't enough to really hurt his ass anyway, and if I could fake it long enough to even hold out and give the impression to these people that I knew something.

Perry was also impeached on numerous other grounds.

Following his testimony, Perry rode in an elevator with Charles Stewart, Sherry Stewart's father, and Dora Hauge, a friend of Mr. Stewart's. According to Hauge and Stewart, Perry told them that he knew Doisher committed the murder and he knew Doisher had thrown the gun in the Knik River.

The state wished to recall Allan Perry to impeach him with this statement. The state also wanted to call Dora Hauge and Charles Stewart to prove that Perry made the statement.[11] The state's theory, which

---

**11.** Perry's testimony about his statement varied significantly from that of Hauge and

Charles Stewart. Hauge and Stewart testified that Perry was unequivocal in what he said: "I

was presented to the trial judge in an evidentiary hearing where the three witnesses testified, was that the statement of Allan Perry was admissible for impeachment purposes. The state argued that Perry's testimony at trial concerning Doisher's statement was much weaker than his earlier grand jury testimony. In addition, Perry had implied he really did not know that much about Doisher's case, but was fabricating testimony in order to get favorable treatment from the prosecution on his own charge. The prosecution argued Perry's statement was admissible to show that Perry really did know more about Doisher than he was willing to say, and that Perry's grand jury testimony, which more strongly implicated Doisher, was more believable than Perry's trial testimony. Doisher argued that Perry's opinion that Doisher killed Sherry Stewart, and threw the .45 caliber automatic in the Knik River, was merely inadmissible opinion testimony. Doisher also argued that an opinion by a friend of his that he killed Sherry Stewart would have great prejudicial impact.

The trial judge ruled that the testimony of Allan Perry, Charles Stewart, and Dora Hauge was admissible to impeach Perry. He further ruled that the probative value of Perry's statements outweighed any unfair prejudicial impact the evidence might have.[12] We do not find that the trial judge committed error in his ruling.

■■■ Opinion testimony can be admissible when used for impeachment purposes:

[W]hen the out-of-court statement is not offered at all as evidence of the fact asserted, but only to show the asserter's inconsistency, the whole purpose of the opinion rule, to improve the objectivity and hence reliability of testimonial assertion, is quite inapplicable. Hence, though many earlier decisions . . . and some later

opinions, exclude impeaching statements in opinion form, the trend of holdings and the majority view is in accord with the commonsense notion that if a substantial inconsistency appears the form of the impeaching statement is immaterial.

C. McCormick, *Law of Evidence*, § 35 at 70 (2nd ed. 1972) (citations omitted). *See also Bentley v. State*, 397 P.2d 976, 978 (Alaska 1965). If the offered statement is ambiguous as to whether or not it is impeaching, it should generally be admitted. The trial judge has considerable discretion in making this decision:

Seemingly the test should be, could the jury reasonably find that a witness who believed the truth of the facts testified to would have been unlikely to make a prior statement of this tenor? Thus, if the previous statement is ambiguous and according to one meaning would be inconsistent with the testimony, it should be admitted for the jury's consideration. In applying the criterion of material inconsistency reasonable judges will be likely to differ, and a fair range of discretion should be accorded to the trial judge. Moreover, it is to be hoped that instead of restricting the use of prior statements by a mechanical use of the test of inconsistency, the courts will lean toward receiving such statements in case of doubt, to aid in evaluating the testimony. (Footnotes omitted.)

C. McCormick, *Law of Evidence*, § 34 at 68–9 (2nd ed. 1972) (footnotes omitted).

■■■ Here Perry's statement could have been merely his opinion that Doisher shot Sherry Stewart, and that Doisher threw the gun into the Knik River. However, it also could show that Perry knew much more than his trial testimony, or even his grand jury testimony suggested, and

---

know Doisher did it. I know he killed her and threw [the gun] in the Knik River." The words related by Hauge and Charles Stewart differed as they described the conversation, but the above is the essence of their testimony. Perry was more equivocal. He stated he told Charles Stewart, "I told him that I thought that on the basis of my knowledge of Bob [Doisher] over

the period that I've known him, it's my belief that he would, to get rid of the weapon, throw it in the Knik River." Perry also denied he said, "I know Bobby did it."

12. The trial judge also gave the jury a cautionary instruction.

that Perry's lack of memory was not genuine, but an attempt to aid Doisher. Perry's statement as related to Charles Stewart and Dora Hauge was positive: "I know Doisher did it," "I know he killed her and threw the gun in the Knik River." This statement could reasonably be interpreted by a jury to indicate that Perry's equivocal trial testimony was watered down in an attempt to aid Doisher. It was therefore not error for the trial judge to conclude that Perry's statements were relevant for the purpose of impeachment.

The next question is whether the probative value of Perry's statement for impeachment purposes was outweighed by the danger of unfair prejudice.[13] This is a question which is within the discretion of the trial judge. The decision of the trial judge may only be reversed if there is an abuse of discretion. Also, there is a presumption in favor of admitting relevant evidence:

> If the balance between probative value and prejudicial effect ... is close, the Judge should probably decide to admit the evidence. In other words, there is a slight presumption in favor of admitting relevant evidence. In order to overcome this minimal presumption, the prejudicial effect must be demonstrably greater than the probative value of the evidence.

Commentary, Alaska R.Evid. 403.

The trial judge carefully balanced the probative value of Perry's statement against the possible unfair prejudice. He held a full evidentiary hearing outside the presence of the jury and gave a cautionary instruction to the jury. We find no error.

## THE TESTIMONY OF PEGGY GARDNER

Doisher contends that the court erred in admitting testimony by Peggy Gardner from which the jury was allowed to infer that he had made an admission by silence.[14] About a month after the murder, Doisher drove to Seward for the day with Gardner and their respective children. When they returned at night, they found Karen Doisher, his wife, spray painting epithets on Gardner's car. On seeing Doisher and Gardner drive up, Karen Doisher got into her car, tried to run it into Gardner's car, and ran it into the house and knocked out a post. Doisher tried to calm his wife and get her out of the car. Eventually, she ran up a hill behind the house, followed by Doisher and Gardner. There, among other things, she said to Gardner, "He'll do to you what he did to Sherry." Doisher made no response to this statement, nor did Gardner.

The trial court ruled that this was an admission by silence and allowed it into evidence. Doisher contends that the conditions for admission set forth in *Blue v. State*, 558 P.2d 636, 645 n.21 (Alaska 1977), were not met, and thus the court was in error. In *Blue*, the court said:

Because of the weakness of the correlation between guilt and an admission by silence or an equivocal or evasive response, the courts have imposed various conditions upon the introduction into evidence of a statement on the theory that it is an implied admission. To constitute proof of such an admission, the evidence must disclose that: (1) the statement was extrajudicial, (2) it was incriminatory or accusative in import, (3) it was one to which an innocent man would in the situ-

---

13. Alaska R.Evid. 403 reads as follows:

Although relevant, evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Alaska R.Evid. 403 had not been adopted at the time this case was tried, but the rule merely codifies the court's common law powers. *See* Commentary, Alaska R.Evid. 403.

14. Professor McCormick describes the theory of an admission by silence, or alternatively, an adoptive admission as follows:

If a statement is made by another person in the presence of a party to the action, containing assertions of facts, which if untrue, the party would under all the circumstances naturally be expected to deny, his failure to speak has traditionally been receivable against him as an admission.

C. McCormick, *Law of Evidence*, § 270 at 651–52 (2d ed. 1972).

ation and surrounding circumstances naturally respond, (4) it was uttered in the presence and hearing of the accused, (5) he was capable of understanding the incriminatory meaning of the statement, (6) he had sufficient knowledge of the facts embraced in the statement to reply to it and (7) he was at liberty to deny it or reply to it.

Doisher's main contention is that the accusation was not made in a situation and under circumstances as to which an innocent man would naturally respond. Doisher maintains that the situation was so tumultuous that it was unreasonable to expect a man to respond to an accusation from his wife when she was in what he characterizes as an hysterical frenzy.

 The trial judge held an evidentiary hearing on this issue. Subsequently, the judge ruled that there was an accusation of a serious crime, that the defendant heard the accusation, and that he did not respond. The trial judge ruled that it was a reasonable inference that Doisher would have normally responded to this accusation, and that his failure to respond was some evidence of guilt which the jury could weigh. We are inclined to give some deference to the trial judge, who heard the witnesses testify, in determining whether the factors, which are a prerequisite to the admission into evidence of an admission by silence, have been met.[15] We hold that there was sufficient evidence to conclude that the testimony of Peggy Gardner was admissible as demonstrating an admission by silence.

There remains the issue of whether the probative value of this admission by silence was outweighed by its prejudicial impact.[16] This is a close question. As the court indicated in *Blue*, the probative value of an admission by silence is often weak. There is certainly a substantial hazard that a jury might misuse the evidence to conclude that Karen Doisher believed that her husband murdered Sherry Stewart.[17] However, under Alaska R.Evid. 403 the trial court does have considerable discretion in determining whether the "probative value is outweighed by the danger of unfair prejudice."[18] The trial court weighed all the factors carefully. We do not find an abuse of discretion.[19]

## THE ADMISSION INTO EVIDENCE OF THE PLASTER CAST

 Doisher objects to the admission into evidence of the plaster cast which the

---

**15.** These are the factors enumerated by the Alaska Supreme Court in *Blue v. State*, 558 P.2d at 645 n.21.

**16.** See Alaska R.Evid. 403 set forth in note 18, and the corresponding discussion, *supra* at 253–254.

**17.** Doisher's wife did not testify at the trial, apparently because Doisher exercised his marital privilege. This privilege is currently embodied in Alaska R.Evid. 505.

**18.** *See also* the Commentary to Rule 403, *supra* at 18.

**19.** We find that *Watson v. State*, 387 P.2d 289, 291 (Alaska 1963), is distinguishable from the present case. In *Watson*, the defendant had shot and killed the victim. The police were summoned, and questioned the defendant for about two hours. Near the conclusion of the investigation by the police, Mrs. Watson, who had not seen the homicide, was informed that her husband had shot the victim. She said to him "It's your temper, your temper has done it again." This statement was admitted into evidence. *Watson* was convicted, and argued on appeal that his wife's statement was not admissible. The prosecution argued on appeal that this was an admission by silence. However, the record did not show whether Watson had responded to this statement. Since the defendant's lack of response, or his equivocal response is a prerequisite to having an admission by silence, the lack of testimony concerning the response was fatal to its admission. The supreme court also said that it was perfectly reasonable to assume that a man who had been questioned for two hours by the police would not respond to such a question from his wife. Although the court did not raise the issue in *Watson*, the defendant also may have had a constitutional right not to answer such a question in the presence of the police. J. Wigmore, Evidence, § 821 n.3 at 309–10 (Chadbourne rev.ed.1970). *Blue v. State*, 558 P.2d 636, 645 n.21 (Alaska 1977). In Doisher's case the testimony was clear that he did not respond to his wife's accusation. Doisher had not been subjected to long police questioning; we do not have a conflict with Doisher's constitutional rights as we could have in a situation in which he was in the presence of police officers.

troopers made of the shoe print found beside the body of Sherry Stewart. He also objects to the admission into evidence of a photograph of the cast. Doisher contends that the cast was in a badly deteriorated condition when it was admitted, and that the photograph and cast were of such poor quality that the admission of them into evidence would mislead the jury.

There is no question that the plaster cast was in a badly deteriorated condition at the time of trial. The cast had apparently been made of a poor quality plaster and did not set up properly. The cast started to deteriorate shortly after it was made in May of 1977. By September 14, 1977, it had split into two pieces, and a photograph of the cast was taken. By the time of trial, the cast was in five pieces.

The trial judge has wide discretion in admitting evidence. The only question for us to determine is whether the trial judge abused his discretion in determining that the probative value of the evidence was outweighed by the danger of unfair prejudice.[20] We hold that there was no abuse of discretion.

The cast was certainly relevant if for no other reason than to show that the troopers had attempted to take a plaster cast at the scene of Sherry Stewart's murder. As a matter of fact, the cast was used by both a state and defense expert to compare with the shoe which was seized from Doisher's home pursuant to the search warrant.

We cannot see how the admission into evidence of the cast or the photograph of the cast could have resulted in unfair prejudice to the defendant, or could have confused or misled the jury. The testimony concerning how the cast was taken and its subsequent deteriorated condition was clear. We find no error.

### THE TESTIMONY OF JOHN SAUVE

Doisher objects to the trial court's ruling that a state witness, John Sauve, could testify as an expert witness. Sauve testified as an expert in comparing

the plaster cast of the shoe print, which was found next to Sherry Stewart's body, with one of the shoes which was seized from Bob Doisher's home. Sauve was the person who took the photograph of the plaster cast, and used that for comparison also. Sauve testified he could not say conclusively that Doisher's shoe made the print, but that it "probably made the print."

At the time Sauve testified, he was a laboratory technician for the state troopers. His main area of expertise was in fingerprint comparisons. He had custody of the cast and ran tests on it. Sauve testified that he had been trained in tool mark comparisons. Sauve testified that a tool mark is classified as the mark left by one object upon another, including the mark left by a shoe upon another object, and the field includes comparisons of objects like shoes with plaster casts. Sauve testified that he had been involved approximately 100 times in the area of cast footprint comparisons. He had never testified in this area before. However, Sauve outlined a long history of on-the-job training in tool mark comparisons. He also testified about his background in photography.

The trial court found that Sauve was qualified as an expert in tool mark comparisons and photography. The court followed the rule in *State v. Phillips*, 470 P.2d 266, 270 (Alaska 1970), and *Ferrell v. Baxter*, 484 P.2d 250, 267 (Alaska 1971), that a witness need not devote full time to an area of knowledge in order to qualify as an expert, and that it suffices if the witness has the requisite intelligence and reasonable contact with the subject matter to demonstrate expertise with reasonable skill.

The question for the trial court to ask in deciding whether to let a person testify as an expert is "whether the jury can receive appreciable help from this particular person on this particular subject." *Handley v. State*, 615 P.2d 627, 631 (Alaska 1980), quoting from *Crawford v. Rogers*, 406 P.2d 189, 192 (Alaska 1965). The trial court has great discretion in making this determina-

**20.** Alaska R.Evid. 403. *See* note 18, *supra.*

tion, and the decisions of the trial court are reviewable only for an abuse of discretion. *Handley*, 615 P.2d at 630. We hold that the trial court did not abuse its discretion in allowing John Sauve to testify as an expert witness.

## JURY INSTRUCTIONS

### A. Instruction Number 7.

 Doisher argues that some of the jury instructions which the court gave were incorrect. Count I of the indictment charged Doisher with premeditated murder in violation of former AS 11.15.010. The court granted Doisher's motion for judgment of acquittal on that count. The court ruled that there was insufficient evidence of premeditation to allow Count I to go to the jury. The court instructed the jury on Count II of the indictment, which charged Doisher with felony-murder in violation of former AS 11.15.010. Count II charged that Doisher killed Sherry Stewart by shooting her in the perpetration of a robbery. This is the count upon which the jury convicted Doisher.

Doisher has appealed because the court mentioned Count I of the indictment in its instructions. The relevant instruction, Instruction Number 7, reads as follows:

#### No. 7

The indictment charges:

That on or about the 17th day of May, 1977 at or near Wasilla, in the Third Judicial District, State of Alaska, Bobby Doisher being of sound memory and discretion, did unlawfully, purposely and with deliberate and premeditated malice kill Anita F. Stewart by shooting her.

#### COUNT II

That on or about the 17th day of May, 1977, at or near Wasilla, in the Third Judicial District, State of Alaska, Bobby Doisher being of sound memory and discretion, did unlawfully and purposely kill Anita F. Stewart by shooting her in the perpetration of robbery.

While the indictment charges two counts of wrongdoing you are instructed that the only count that you should consider is Count II of this indictment. You must disregard in its entirety Count I and confine your deliberations to the allegations and the essential elements of Count II.

There was no objection to this instruction, and therefore Doisher asks this court to find that giving this instruction was plain error. *Burford v. State*, 515 P.2d 382 (Alaska 1973). We do not find that it was error to give this instruction. The instruction clearly tells the jury to disregard Count I. The jury was aware of both counts of the indictment. At the beginning of the trial, the trial judge read the indictment. Therefore, it may very well have been less confusing and less prejudicial to let the jury be aware that Count I was no longer before them, and that they should disregard Count I. Since Doisher did not object or point out any possibility of prejudice at trial, it is reasonable for us to assume that he felt this was a reasonable procedure. We find no error.

### B. Instruction Number 3.

 Doisher also contends that the trial court was incorrect in giving Instruction Number 3, which reads as follows:

#### No. 3

Before a person may be found guilty of a crime, the State at the very least must have proven beyond a reasonable doubt that that person intentionally committed an act forbidden by law. Therefore, before the defendant in this case may be found guilty of a crime, you must find that the State has established beyond a reasonable doubt that under the statute set out in these instructions, the defendant was forbidden to do the act charged in the indictment, and that he in fact knowingly committed the act.

A person's knowledge of doing the act may be shown by the circumstances attending the doing of it, the manner in which it is done, the means used, and the soundness of mind and discretion of the person committing said act.

*The law assumes that every person intends the natural consequences of his voluntary acts. Therefore, the intent that is required to be proven as an element of a crime may be inferred from a defendant's voluntary commission of the act forbidden by law.* [emphasis added.]

Doisher did not object to this instruction at trial. He must therefore meet the plain error standard.[21] Doisher contends that the emphasized language of the above instruction shifts the burden of proof to him to show any defense of lack of intent.

In *Menard v. State*, 578 P.2d 966, 968 (Alaska 1978), and *Howard v. State*, 583 P.2d 827, 831 (Alaska 1978), the Supreme Court of Alaska condemned use of the so-called *Mann*[22] instruction. That instruction reads as follows:

It is reasonable to infer that a person ordinarily intends the natural and probable consequences of acts knowingly done or knowingly omitted. *So unless the contrary appears from the evidence*, the jury may draw the inference that the accused intended all the consequences which one standing in like circumstances and possessing like knowledge should reasonably have expected to result from any act knowingly done or knowingly omitted by the accused. [Emphasis supplied].

*Menard*, 578 P.2d at 968 (emphasis in original). The Alaska Supreme Court held that although giving the above instruction was

error, "we decline to hold that this error will always be deemed reversible." *Menard*, 578 P.2d at 970. The key language which creates the problem in the above instruction is the emphasized portion, "So unless the contrary appears from the evidence." This language could be interpreted as shifting the burden of proof to a defendant. This language is not present in the instruction which the trial court gave in Doisher's case. The language "the law assumes" in the instruction in Doisher's case may create similar problems, but the language is not as objectionable as the language "So unless the contrary appears from the evidence."

The instruction given in Doisher's case is far superior to the instruction complained of in *Menard*. Also, Doisher's intent was not a key issue in the case: the state pursued a felony murder theory, while Doisher contended that he did not shoot Sherry Stewart at all. We hold that giving Instruction Number 3 was not plain error.[23]

C. Instruction Number 4.

▇▇▇▇ Doisher also argues that Instruction Number 4 erroneously placed upon him the duty of producing evidence of an affirmative defense. The language complained of in Instruction Number 4 reads as follows:

The law does not impose upon a defendant the duty of producing any evi-

**21.** *See* discussion page 257, *supra*.

**22.** The instruction given in *Menard* is identical to the instruction given in *Mann v. United States*, 319 F.2d 404, 407 (5th Cir. 1963), *cert. denied*, 375 U.S. 986, 84 S.Ct. 520, 11 L.Ed.2d 474 (1964).

**23.** We would refer the trial courts to two alternative instructions approved by the 5th Circuit in *United States v. Chiantese*, 560 F.2d 1244, 1255–56 (5th Cir. 1979). Those instructions read as follows:

1. It is reasonable to infer that a person ordinarily intends the natural and probable consequences of his knowing acts. The jury may draw the inference that the accused intended all of the consequences which one standing in like circumstances and possessing like knowledge should reasonably have expected to result from any intentional act or conscious omission. Any such inference

drawn is entitled to be considered by the jury in determining whether or not the government has proved beyond a reasonable doubt that the defendant possessed the required criminal intent.

2. Intent ordinarily may not be proved directly, because there is no way of fathoming or scrutinizing the operations of the human mind. But you may infer the defendant's intent from the surrounding circumstances. You may consider any statement made and [any act] done or omitted by the defendant, and all other facts and circumstances in evidence which indicate his state of mind.

You may consider it reasonable to draw the inference and find that a person intends the natural and probable consequences of acts knowingly done or knowingly omitted. As I have said, it is entirely up to you to decide what facts to find from the evidence.

dence, except if he has stated an affirmative defense under the law.

Doisher did object to this instruction.

In most cases a defendant is required to present some evidence of the existence of an affirmative defense in order to have the benefit of the affirmative defense. Some examples where an affirmative defense requires this are insanity defenses or a claim of self defense. W. LaFave & A. Scott, *Criminal Law* § 8 at 47 (2d ed. 1972). In this case Doisher did raise an alibi defense, but alibi is not an affirmative defense.[24] The court gave the jury an instruction on alibi.[25] The alibi instruction makes it clear that the prosecution had the burden of proving Doisher's presence at the scene beyond a reasonable doubt. The instruction does not discuss whether this was an affirmative defense where Doisher had a duty to present some evidence. However, the instruction makes it clear that Doisher did present evidence on this issue, and that the prosecution had the duty to prove his presence at the scene beyond a reasonable doubt. We find no error.

D. The Robbery Instruction.

■■■ Doisher contends that Instruction Number 9 was defective in that it failed to define all the elements of the crime of robbery, including the requirement of specific intent to permanently deprive the victim of something of value:

### No. 9

The essential elements which the state must prove to warrant conviction of the defendant of the crime of murder in the first degree by perpetrating robbery as charged in Court II of the indictment are:

That on or about the 17th day of May, 1977 at or near Wasilla, in the Third Judicial District, State of Alaska, Bobby Doisher, being of sound memory and discretion did unlawfully, purposely kill Anita F. Stewart by shooting her in the perpetration of robbery or attempting to perpetrate robbery.

Robbery is defined as follows:

"A person, who by force or violence, or by putting in fear, steals and takes anything of value from the person of another is guilty of robbery . . ."

If the state has proved these essential elements to your satisfaction beyond a reasonable doubt then you should find the defendant guilty, but if the state has failed to prove any of the essential elements beyond a reasonable doubt then you should acquit the defendant.

When all of the evidence considered by you and taken as a whole points equally to the defendant's innocence as well as his guilt, you must give the defendant the benefit of the doubt and find him not guilty.

Doisher objected to Instruction Number 9, but on the ground that he felt the jury should be instructed that in order to find the defendant guilty of robbery, they must find he committed all the elements of robbery. He did not specifically request that all the elements be set out. He did not specifically mention anything about the requirement of a specific intent to perma-

---

**24.** In most cases the prosecution must prove the defendant was present at the scene of the crime. The defendant can create a reasonable doubt that he was present at the scene of the crime by proving alibi—that he was somewhere else. Alibi is not an affirmative defense and the defendant has no duty to prove alibi. By raising an alibi defense he is merely rebutting the prosecution case. *State v. Skinner*, 503 P.2d 381 (Kan.1972); *People v. Pearson*, 19 Ill.2d 609, 169 N.E.2d 252, 255 (1960).

**25.** The alibi instruction which the court gave reads as follows:

The nature of the offense with which the defendant is here charged is such that his presence at the time and place of its commission is essential to his guilt, and the burden is upon the State to prove beyond a reasonable doubt that the defendant was then and there present.

The defendant in this case has introduced evidence tending to show that he was not present at the time and place of the commission of the alleged offense for which he is here on trial. If, after a consideration of all the evidence, you have a reasonable doubt that the defendant was present at the time the crime was committed, he is entitled to an acquittal.

nently deprive the victim of something of value. It is therefore not clear that he requested the trial court to instruct the jury on all the elements of robbery. However, we do not need to reach the issue of whether Doisher properly raised his objection. We hold that the jury was properly instructed under the facts of this case. The robbery statute itself as set forth in the instruction adequately informed the jury of the major elements of robbery for purposes of this case.[26] The only element of robbery which Doisher has pointed out which is not clearly covered by the statutory language is the element of specific intent to permanently deprive the person of the property. However, in the context of this felony-murder by robbery it is patently absurd to suggest that the perpetrator did not intend to permanently deprive the owner of the property. We find no error.[27]

E. Instructions on Admission By Silence.

Doisher has objected to the instructions which the court gave on admissions by silence. The court's instructions were as follows:

### No. 16

In this case there has been testimony elicited that an incident occurred at the defendant's home in Eagle River, when the defendant and the witness Peggy Gardner returned from Seward, that the defendant's wife made a statement, in the presence of the defendant, to Peggy Gardner as follows:

"He's going to do to you what he did to Sherry."

The evidence further indicates that the defendant made no response to this statement.

You are instructed that if a statement is made by another person in the presence of a party to the action, containing assertions of fact which, if untrue, the party would under all the circumstances naturally be expected to deny, his failure to speak is circumstantial evidence that he believes the statements to be true and his conduct is thus receivable against him as an admission of such belief. The justification for receiving such evidence is not based upon the assumption that the party has intended to express his assent and thus has adopted the statement as his own, nor upon the theory that a duty or obligation to speak has been cast upon him, but rather upon the probable state of belief to be inferred from his conduct. It is the failure to deny that is significant.

### No. 17

Evidence of such an accusatory statement must be viewed with utmost caution. In determining the weight to be given to it, you should consider all the circumstances under which it was made. When silence is the only response by the defendant, the accusation must have occurred (1) in the defendant's presence; (2) within his hearing; (3) he must have understood it; (4) it ordinarily must have embraced facts within his personal knowledge; (5) he must have been physically able to speak; (6) psychologically at liberty to speak; and (7) the statement and surrounding

26. 1 California Jury Instructions, Criminal Instr. 9.10, at 367 (4th rev. ed. 1979), sets out the elements of robbery as follows:

In order to prove the commission of the crime of robbery, each of the following elements must be proved:

1. That a person had possession of property of some value however slight,
2. That such property was taken from such person or from his immediate presence,
3. That such property was taken against the will of such person,
4. That the taking was accomplished either by force or violence or by fear or intimidation or by both, and

5. That such property was taken with the specific intent permanently to deprive such person of the property.

27. The Supreme Court of Alaska decided that it was unnecessary to list the elements of robbery other than by reciting the statute in *Thomas v. State*, 391 P.2d 18, 24–5 (Alaska 1964). However, we wish to caution that these cases turn on their specific facts, and that generally it is the better practice to instruct on the specific elements of robbery.

circumstances must have naturally called for a reply.

Doisher first objects on the ground that the beginning of Instruction Number 16 is an unwarranted comment on the evidence. However, these facts were uncontested. Doisher testified that Karen Doisher made the statement to Peggy Gardner in his presence after he and Peggy Gardner had returned from a trip to Seward. Also Doisher never specifically objected to the instruction on the ground that it constituted a comment on the evidence. We therefore hold that the factual statement made in the "admission by silence" instructions did not constitute error under these facts.

Doisher also contends that the "admission by silence" instructions were confusing, and misstated the law. The instructions on the admission by silence could probably have been better drafted. However, taking the two instructions as a whole, we believe that they adequately communicated the law to the jury. C. McCormick, Law of Evidence § 270, at 651–52 (2nd ed. 1972).

## THE DENIAL OF DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL

Doisher argues that the trial court should have granted his motion for judgment of acquittal on Count II of the indictment. Count II was the felony-murder (robbery) count. The court did grant Doisher's motion for judgment of acquittal on Count 1 of the indictment, finding insufficient evidence of premeditation.

Both parties agree that the proper standard of review for this court is stated in *Beck v. State*, 408 P.2d 996, 997 (Alaska 1965):

[T]he evidence and the inferences to be drawn therefrom are to be viewed in a light most favorable to the state. The question, then, is whether the finding of guilt is supported by substantial evidence, that is, such relevant evidence which is adequate to support a conclusion by a reasonable mind that there was no reasonable doubt as to appellant's guilt.

We have reviewed the record and evidence in this case, and hold the trial court was correct in denying Doisher's motion for judgment of acquittal.

## DOUBLE JEOPARDY

Doisher argues that the court committed error in submitting Count II, the felony murder count, to the jury. He contends that since the court granted the motion for judgment of acquittal on Count I, premeditated murder, and since Count I and Count II involved the same conduct, he was twice placed in jeopardy for the same offense.[28]

This contention has no merit. Premeditated murder and felony murder are two separate theories constituting first degree murder under former AS 11.15.010.[29] Premeditated murder requires "deliberate and premeditated malice."[30] Felony murder

---

28. U.S.Const. amend. V; Alaska Const. art. 1, § 9.

29. Former AS 11.15.010 reads as follows:

A person who, being of sound memory and discretion, purposely, and either of deliberate and premeditated malice or by means of poison, or in perpetrating or in attempting to perpetrate, rape, arson, robbery, or burglary kills another, is guilty of murder in the first degree, and shall be sentenced to imprisonment for not less than 20 years to life. This statute has now been repealed and replaced by AS 11.41.100 and AS 11.41.110.

30. The following instruction defining premeditation and deliberation was approved in *Gray v. State*, 463 P.2d 897, 905 n.11 (Alaska 1970):

Murder in the first degree as charged in the Indictments must be accompanied by a clear deliberate intent to take life. The intent to kill must be the result of deliberation and must have been formed upon a pre-existing reflection and not under a heat of passion or other condition such as precludes the idea of deliberation.

The law does not require that such deliberation shall exist for any particular period of time or that any prescribed period of time shall elapse between the formation of the intent to kill and the act of killing. It is necessary only that the act of killing be preceded by, and be the result of a concurrence of will, deliberation and premeditation on the

does not require "deliberate and premeditated malice"; it requires only that there be an intentional killing during the commission of certain felonies. Therefore premeditated murder and felony murder require proof of different elements, and it is possible to be convicted of felony murder even though there is not enough evidence of premeditation to go to the jury on premeditated murder.[31] There is no violation of double jeopardy.

The judgment of the superior court is AFFIRMED.

BRYNER, C. J., not participating.

part of the slayer to constitute murder in the first degree, regardless of how rapidly or slowly these mental processes succeed each other or how quickly or tardily they are followed by the act of killing.

The law does not undertake to measure in units of time the length of the period during which the thought must be pondered before it can ripen into an intent to kill which is truly deliberate and premeditated. The time will vary with different circumstances. The time will vary with different individuals and under varying circumstances. The true test is not the duration of time, but rather the extent of the reflection. A cold, calculated judgment and decision may be arrived at in a short period of time, but a mere unconsidered and rash impulse, even though it includes an intent to kill, is not such deliberation and premeditation as will fix an unlawful killing as murder of the first degree. To constitute a deliberate and premeditated killing, the slayer must weigh and consider the question of killing and reasons for and against such a choice, and having in mind the consequences decide to and commit the unlawful act causing death.

31. For a discussion on the differences between felony murder and premeditated murder under former AS 11.15.010, *See Gray v. State*, 463 P.2d 897 (Alaska 1970). In *Gray*, both Willie Gray and Dewey Gray were convicted of premeditated murder and felony murder for killing a police officer during an armed robbery of a liquor store. On appeal, the convictions for felony murder were reversed because the trial court did not instruct that felony murder requires an intentional killing. Willie Gray's premeditated murder count was dismissed and he was retried and convicted of felony murder. *Gray v. State*, 487 P.2d 680 (Alaska 1971). Dewey Gray's conviction for premeditated murder was affirmed, and his felony murder conviction was reversed. The court also held that although it was proper to go to the jury on both premeditated murder and felony murder, and that although it was possible for a person to be guilty of both charges, only one conviction could be entered as a person should be guilty of only one offense for one murder even though he might be guilty under two different theories. *Gray*, 463 P.2d at 910–11.